ENVIRONMENTAL PROTECTION
INFORMATION CENTER,
Plaintiff,

v.

Jack BLACKWELL, et al., Defendants.

No. C–03–4396 EMC.

United States District Court,
N.D. California.

Oct. 13, 2004.

1176

Sharon Eileen Duggan, Law Offices of Sharon E. Duggan, Berkeley, CA, Erik Schlenker–Goodrich, Taos, NM, Peter M.K. Frost, Eugene, OR, for Plaintiff.

Owen Peter Martikan, United States Attorney, San Francisco, CA, for Defendants.

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Docket Nos. 29, 30)**

CHEN, United States Magistrate Judge.

## TABLE OF CONTENTS

I. FACTUAL BACKGROUND .......................................... 1179

II. LEGAL STANDARD ............................................... 1183
 A. Judicial Review of Agency Action ......................... 1183
 B. Injunctive Relief ......................................... 1183

III. DISCUSSION ................................................... 1184
 A. NEPA .................................................. 1184
 1. Cumulative Effects ................................... 1184
 a. Information About Past and Reasonably Foreseeable Future
 Timber Sales ..................................... 1186

 b. Conclusory Cumulative Impacts Analysis ........................1190
 c. Effects of Roads ..........................................1192
 2. Convincing Statement of Reasons for FONSI .........................1194
 a. Area Between YBME Wilderness and Buttermilk LSR ...........1195
 b. Threatened Violation of NFMA ...............................1197
 3. Reasonable Range of Alternatives ..................................1198
 a. Purpose and Need Statement .................................1200
 b. Range of Alternatives ......................................1201
 4. Public Participation ..............................................1203
 B. NFMA ...............................................................1205
 1. Subject Matter Jurisdiction Under APA .............................1207
 2. Monitoring Obligations ...........................................1208
 3. Proxy-on-Proxy Approach .........................................1214
 4. Sufficient Information About Habitat ...............................1217
 5. Sufficiency of Habitat .............................................1218
 6. Inventory of Goshawk .............................................1219
 C. FS's Motion to Strike .................................................1220
 D. Injunctive Relief .....................................................1221

IV. CONCLUSION ...............................................................1222

Plaintiff Environmental Protection Information Center ("EPIC") has filed suit against the United States Forest Service ("FS") and various individuals in their official capacities, alleging that the FS violated both the National Environmental Policy Act ("NEPA") and the National Forest Management Act ("NFMA") by authorizing the Divide Auger ("DA") Timber Sale in the Mendocino National Forest ("MNF"). More specifically, EPIC asserts that the FS violated NEPA: (1) by failing to take a hard look at the cumulative impacts on late-successional wildlife and wildlife habitat; (2) by failing to provide a convincing statement of reasons for its finding of no significant impact ("FONSI"); (3) by failing to consider a reasonable range of alternatives; and (4) by failing to diligently involve the public. EPIC contends that the FS violated NFMA by failing to ensure species diversity and viability with respect to the northern spotted owl, the northern goshawk, the Pacific fisher, and the American pine marten.

The parties filed cross-motions for summary judgment on April 14, 2004. A hearing on the motions was held on June 9, 2004. Supplemental briefing was provided by the parties in August and September 2004. Having reviewed the parties' briefs and accompanying submissions as well as the administrative record, and having considered the oral argument of counsel, and good cause appearing therefor, the Court hereby GRANTS in part and DENIES in part EPIC's motion for summary judgment and GRANTS in part and DENIES in part the FS's motion for summary judgment. Because EPIC's motion for summary judgment is granted in part, the Court issues an injunction as discussed in further detail below.

## I. *FACTUAL BACKGROUND*

At issue in this case is the FS's decision to authorize the DA Timber Sale, which will take place in the MNF. The MNF is governed by the MNF Land and Resource Management Plan of 1995 ("MNF Plan") as well as by the Northwest Forest Plan of 1994 ("NW Forest Plan"). *See* AR 2029 (MNF Plan; stating that the MNF Plan "fully incorporates all applicable land allocations and standards and guidelines" of the NW Forest Plan).

The NW Forest Plan provides in part standards and guidelines for management of habitat for late-successional and old-growth forest related species within the

range of the northern spotted owl. *See* AR 1604 *et seq.* (NW Forest Plan). "Late-successional forests are those forest seral stages that include mature and old-growth age classes." AR 1703 (NW Forest Plan). Species that depend on old-growth forests include the northern spotted owl, goshawk, fisher, and marten. *See* AR 4451 (MIS Report). Indeed, each of these species is considered a management indicator species ("MIS") for old-growth forests. *See* AR 4451 (MIS Report). MIS

> function as barometers for wildlife communities. These species were selected because: 1) they are believed to represent the vegetation types, successional stages, and special habitat elements necessary to provide for viable populations of all species in the Forest; and 2) their population changes are believed to indicate or represent the effects of management activities on wildlife and fish.

AR 1982 (MNF Plan); *see also* AR 1984 (MNF Plan; listing MIS and ecological elements represented in Table 3–9).

The NW Forest Plan allocates land into seven different categories. For purposes of this case, the two categories that merit discussion are late-successional reserves ("LSRs") and matrix lands. LSRs are federal lands within the range of the northern spotted owl that "are designed to serve as habitat for late-successional and old-growth related species including the northern spotted owl." AR 1615 (NW Forest Plan). A fully functional LSR is not only one that "contain[s] well connected late successional habitat" but also is "connected to other LSRs through dispersal habitat for both aerial and ground traversing species." AR 3360 (LSR Assessment).

Matrix lands are federal lands within the range of the northern spotted owl "in which most timber harvest and other silvi-

cultural activities will be conducted."[1] AR 1616 (NW Forest Plan). While most timber harvest will be conducted in matrix lands, matrix lands also "contain non-forested areas as well as forested areas that may be technically unsuited for timber production." AR 1616 (NW Forest Plan). In addition, when there is a northern spotted owl activity center on matrix land— "'[a]ctivity center' is defined as an area of concentrated activity of either a pair of spotted owls or a territorial single owl"— then "[o]ne hundred acres of the best northern spotted owl habitat will be retained as close to the nest site or owl activity center as possible" and "[t]imber management activities within the 100–acre area should comply with management guidelines for Late–Successional Reserves." AR 1746 (NW Forest Plan). This one hundred acre area is called a "100 acre LSR/core." AR 4421 (Wildlife BA; defining term as "an area of 100 acres of the most suitable habitat designed for each [activity center] on Matrix land occurring outside of the LSR RC network"). The area of habitat within a 1.3–mile radius from an owl activity center is called the home range. *See* AR 4421 (Wildlife BA); *see also* AR 4507 (MIS Report; stating that, "[b]ecause ... the actual configuration of the home range is rarely known, the estimated home range of an owl pair is represented by a circle with an area of 3,340 acres, with a 1.3–mile radius centered upon the owl activity center"). The Fish & Wildlife Service ("FWS") recommends a minimum of 1,336 acres of nesting and foraging habitat—*i.e.,* 40 percent of the acres in the home range—to support a pair of nesting spotted owls. *See* AR 4467 (FWS Biological Opinion).

The DA Timber Sale will take place on matrix lands in the MNF, more specifically on matrix lands in the Thomes Creek Wa-

---

1. Silviculture is a branch of forestry dealing with the development and care of forests. *See*

http://www.m-w.com/ home.htm (Merriam–Webster online; last visited July 2, 2004).

tershed. *See* Docket No. 40(map).[2] The entire project area for the DA Timber Sale encompasses 2,882 acres, *see* AR 4415 (Wildlife BA), and is divided into a northern portion and a southern portion. *See* Docket No. 40(map); *see also* AR 4583–84 (maps). There is a total of twenty-one harvest units, thirteen in the north and eight in the south. *See* AR 4415 (Wildlife BA). The northern part of the project is located directly between the Yolla Bolly Middle Eel Wilderness ("YBME Wilderness") and the Buttermilk LSR (also known as RC 309) and encompasses two northern spotted owl activity centers known as 1008 and 1052. *See* Docket No. 40(map); AR 4583(map). The southern part of the project is located close to a portion of the Buttermilk LSR and encompasses owl activity center 1001. *See* Docket No. 40(map); AR 4584(map).

In February 2002, the FS issued for public comment its first Environmental Assessment ("EA") for the DA Timber Sale. *See* AR 4588 (Decision Notice and FONSI). "As a result of public comments, the ... proposed action was dropped and a new proposed action developed." AR 4588–89 (Decision Notice and FONSI). In October 2002, a new EA was issued for public comment, and a legal notice regarding the sale was posted in November 2002. *See* AR 4589 (Decision Notice and FONSI). This EA put forth three alternatives with respect to the DA Timber Sale: (1) no action (Alternative A), (2) logging in the southern harvest units only (Alternative B), or (3) logging in both the northern and southern harvest units (Alternative C, the proposed action). *See* AR 4600–06(EA).

Based on the EA, the FS issued its Decision Notice and FONSI on June 6, 2003. *See* AR 4592 (Decision Notice and FONSI). The FS selected Alternative C as the preferred alternative. *See* AR 4591 (Decision Notice and FONSI). Under Alternative C, the proposed action, 4.5 million board feet ("MMBF") of timber from 264 net acres of forest land will be harvested, for a net value of approximately $665,542. *See* AR 4588 (Decision Notice and FONSI). "Based on silvicultural review, approximately 123 acres are proposed for green tree retention, 101 acres would have the over story trees removed and 40 acres of the oldest, best condition trees would be retained to provide habitat for old growth wildlife and vegetation." [3]

---

**2.** At the request of the Court, the parties prepared a map showing on one piece of paper the location of "key" sites such as the northern part of the project area, the southern part of the project area, the harvest units, the Yolla Bolly Middle Eel Wilderness, the Buttermilk LSR, and certain owl activity centers. Although the administrative record contains a number of maps, *see, e.g.,* AR 4583–84 (maps), the Court was not able to find a map that compiled all of the relevant information in one place. The map prepared by the parties is appended to this opinion. *See* Appendix A.

At the hearing on the parties' crossmotions for summary judgment, the Court asked the parties if they objected to including this map as part of the trial court record. The FS had no objection. EPIC also had no objection though it noted that the map was not part of the administrative record. The Court recognizes such and limits its reliance on the map

to providing information about general geographic location.

**3.** According to the EA,

Green Tree Retention is a timber management prescription used to regenerate stands by retaining a number of overstory trees per acre or a percentage of the area associated with each harvest unit. The primary basis for retaining these green trees is to provide for dispersal of numerous organisms such as plants, animals, fungi, mollusks, bryophytes, etc. Other purposes include maintaining visual quality, provide future opportunities for recruitment of snags and downed logs, increasing vertical diversity within stands, and to retain native genetic diversity.

... Overstory removal is used to regenerate stands which have relatively light stocking in their overstories and substan-

AR 4593(EA). The forty acres were retained pursuant to the MNF Plan, which provides as a forest-wide standard and guideline, "[m]aintain at least 15% of federal forest lands within fifth field watersheds (20–200 square miles) in late-successional forest." AR 2020 (MNF Plan).

"Approximately five acres of nesting habitat [for the northern spotted owl] and 154 acres of foraging habitat [will] be removed" under Alternative C, the proposed action. AR 4470 (MIS Report); *see also* AR 4468 (MIS Report; noting that, in the project area, there are approximately 768 acres of nesting habitat and 399 acres of foraging habitat and that, in the Thomes Creek Watershed, there are approximately 16,036 acres of nesting habitat and 16,424 acres of foraging habitat). The five acres of nesting habitat will be from the southern units as will approximately 54 of the 154 acres of foraging habitat.[4] *See* AR 4424 (Wildlife BA); AR 4469–70 (MIS Report).

According to the EA for the DA Timber Sale, the sale will serve the following purposes and needs:

(1) "[T]o achieve a desired condition of an even-age, fire resilient forest while providing an adequate timber supply that contributes to economic stability of rural communities by generating economic activity, income and employment."[5]

(2) "[To] minimiz[e] the spread of ... pathogens [such as insects and diseases] to prevent ... [l]oss of timber volume[;] [r]eduction in visual quality ... caused by the long-term loss of trees due to insect and disease

tial numbers of small conifers (seedlings, saplings, and poles) in their under stories. Under this method, the protection/seed source from the overstory trees *is* no[ ] longer needed. These trees are competing with the newly established understory for light and nutrients. The overstory trees are typically removed[;] however, some may be retained where isolated patches of trees are needed for wildlife and/or other resource needs.
AR 4611(EA).

**4.** At the hearing on the parties' cross-motions for summary judgment, the FS proffered for the first time a declaration from Jesse Rosenquist, a silviculturalist for the FS, which noted that the DA Timber Sale as "originally planned" included the "harvest of five acres of nesting habitat for the Northern Spotted Owl ... in the southern portion of the Divide Auger project area" but, as "currently planned," the harvest no longer includes the harvest of these five acres "or any other nesting habitat for the Northern Spotted Owl." Rosenquist Decl. ¶¶ 2–3. The FS stated that, so far as it knew, this meant that there would be a net reduction in the number of acres to be harvested (*i.e.*, the five acres would not be "made up" elsewhere in the project area).

After having a chance to review the declaration, EPIC stated that it did not object to admission of the declaration but felt the declaration was untimely. More specifically, EPIC noted that, according to the declaration, the FS became aware that the five acres would not be harvested in the summer of 2003, which was about the time it issued the Decision Notice and FONSI and which was well before resolution of the administrative appeal (in September 2003). However, the FS never brought this fact up until the hearing before this Court on the parties' cross-motions for summary judgment.

That the DA Timber Sale—as of date—will not involve harvesting on the five acres of nesting habitat is of no consequence, at least for purposes of this opinion. The Court's analysis below does not depend on the issue of whether or not there will be harvesting on these acres.

**5.** "The Divide Auger Sale has been proposed to meet a portion of the 4,481 acres of the 'timber modified' emphasis requirements agreed to within Management Area # 35 of the [MNF Plan]." AR 4594(EA); *see also* AR 2079 (MNF Plan). The MNF Plan describes the management prescription of "timber modified" as "provid[ing] emphasis on timber production while providing for other resource objectives, including visual quality, watershed, rare and endemic species, and wildlife." AR 2054 (MNF Plan).

manifestations[;][i]ncreased fuels near the wilderness boundary from dead and dying trees[;][s]pread of insects and disease within riparian reserves, late successional reserves, and the wilderness that would result in the loss of dispersal habitat for wildlife species." The disease *H. annosum* is a special concern for the northern units. While this disease is a "normal part of western forest ecosystems and contributes to structural and compositional diversity," it "has increased in recent decades."

(3) "[T]o increase the presence of mixed conifers, decrease the presence of red and white fir, and to protect and encourage the growth of oak."

(4) "[T]o reduce natural fuels to levels that can be managed with hand crews...."

AR 4594–95(EA).

## II. *LEGAL STANDARD*

### A. *Judicial Review of Agency Action*

Both parties agree, as does the Court, that judicial review of the FS's Decision Notice and FONSI is governed by the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 706; *see also Earth Island Inst. v. United States Forest Service,* 351 F.3d 1291, 1300 (9th Cir.2003) (stating that judicial review of agency decisions under both NEPA and NFMA is governed by APA). Under Section 706(2), a reviewing court shall "hold unlawful and set aside agency action, findings and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." *Id.* § 706(2)(A), (D).

The Supreme Court has stated that, as a general rule under the APA,

[t]he scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judg-

ment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." In reviewing that explanation, we must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies; we may not supply a reasoned basis for the agency's action that the agency itself has not given. We will, however, "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."

*Motor Vehicle Manufacturers Ass'n of United States v. State Farm Mut. Automobile Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *see also Westlands Water Dist. v. United States Department of Interior,* 376 F.3d 853, 865 (9th Cir.2004) ("[A] reviewing court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. This inquiry must be searching and careful, but the ultimate standard of review is a narrow one.' ").

### B. *Injunctive Relief*

The Supreme Court has also stated that, unless a statute restricts a court's jurisdiction in equity, the full scope of that juris-

diction is to be recognized. *See Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). The authority to order injunctive relief obtains under NEPA and NFMA. The Ninth Circuit has specifically noted that "[t]here is nothing in NEPA to indicate that Congress intended to limit [a] court's equitable jurisdiction." *Save the Yaak Committee v. Block,* 840 F.2d 714, 722 (9th Cir.1988). Although the Ninth Circuit does not appear to have addressed this issue squarely with respect to NFMA, it has proceeded under the assumption that claims under the statute encompass injunctive relief. *See, e.g., Forest Conservation Council v. United States Forest Serv.,* 66 F.3d 1489, 1496 (9th Cir.1995) (discussing whether injunction should issue if district court found violation of either NEPA or NFMA).

There are well-established principles governing awards of injunctive relief. *See Save the Yaak,* 840 F.2d at 722. Generally, the basis for such relief is irreparable injury and inadequacy of legal remedies. " 'In each case, a court must balance the competing claims of injury and must consider the effect on each party of granting or withholding of the requested relief.' " *Id.* In the context of environmental claims, the Ninth Circuit has indicated that, absent "unusual circumstances," injunctive relief is the appropriate remedy for a violation of either NEPA or NFMA. *See Forest Conservation,* 66 F.3d at 1496 (noting that, if court determines there is violation of either statute, injunction "will not automatically issue" and that defendant "should be allowed to present evidence to the court that 'unusual circumstances' weigh against the injunction sought, and to present evidence to assist the court in fashioning the appropriate scope of whatever injunctive relief is granted"). Absent documentation of such "unusual circumstances," injunctive relief typically follows from a finding of a violation of NEPA or

NFMA in a case such as this. The Court therefore first focuses on the substantive claims.

## III. *DISCUSSION*

### A. *NEPA*

#### 1. *Cumulative Effects*

EPIC's first argument is that the FS violated NEPA because it failed to take a hard look at the cumulative effects of the DA Timber Sale and other sales on late-successional wildlife and wildlife habitat.

NEPA is " 'our basic national charter for protection of the environment.' " *Center for Biological Diversity v. United States Forest Serv.,* 349 F.3d 1157 1166 (9th Cir.2003); *see also* 40 C.F.R. § 1500.1 (same). There are two goals underlying the statute: "(1) to ensure that the agency will have detailed information on significant environmental impacts when it makes decisions; and (2) to guarantee that this information will be available to a larger audience." *Neighbors of Cuddy Mt. v. Alexander,* 303 F.3d 1059, 1063 (9th Cir. 2002) [hereinafter *Alexander*]; *see also Earth Island,* 351 F.3d at 1300 ("NEPA requires that a federal agency 'consider every significant aspect of the environmental impact of a proposed action ... [and] inform the public that it has indeed considered environmental concerns in its decision-making process.' ").

■ "NEPA does not contain substantive environmental standards and guidelines, nor does the Act mandate 'that agencies achieve particular substantive environmental results.' " *Center for Biological Diversity,* 349 F.3d at 1166. Rather, "NEPA imposes procedural requirements designed to force agencies to take a 'hard look' at [the] environmental consequences" of their actions. *Earth Island,* 351 F.3d at 1300. "This includes considering all foreseeable direct and indirect impacts.

Further, NEPA requires that an environmental analysis for a single project consider the *cumulative impacts* of that project together with all past, present and reasonably foreseeable future actions." *Idaho Sporting Cong. v. Rittenhouse,* 305 F.3d 957, 973 (9th Cir.2002) [hereinafter *Rittenhouse* ] (emphasis added); *see also* 40 C.F.R. § 1508.7 (defining cumulative impact as "the impact on the environment which results from the incremental impact of the [proposed agency] action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions"). The regulations implementing NEPA[6] note that "[c]umulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.*

 Notably, an agency must take a hard look at cumulative impacts whether an EIS or EA is involved. *See Churchill County,* 276 F.3d at 1081 (interpreting the regulations implementing NEPA as requiring that an EIS consider the cumulative impacts of the proposed agency action); *Kern v. United States Bureau of Land Mgmt.,* 284 F.3d 1062, 1076 (9th Cir.2002) (stating that an EA "may be deficient if it fails to include a cumulative impact analysis"). In fact, even though an EA is supposed to be a "concise public document," 40 C.F.R. § 1508.9, the Ninth Circuit has underscored the importance of a cumulative impacts analysis in an EA:

The importance of analyzing cumulative impacts in EAs is apparent when we consider the number of EAs that are prepared. The Council on Environmental Quality noted in a recent report that "in a typical year, 45,000 EAs are prepared compared to 450 EISs.... Given that so many more EAs are prepared than EISs, adequate consideration of cumulative effects requires that EAs address them fully."

*Kern,* 284 F.3d at 1076 (quoting CEQ, *Considering Cumulative Effects Under the National Environmental Policy Act* 4 (Jan.1997), *also available at* http://ceq.eh.doe. gov/nepa/ccenepa/ ccenepa.htm (last visited October 13, 2004)). Because cumulative impacts analysis is important to both an EIS as well as an EA, the Court concludes that it is appropriate to look to case law on cumulative impacts analyses in EISs for guidance even though this case involves an EA rather than an EIS.

As noted above, EPIC argues that the FS violated NEPA by failing to take a hard look at the cumulative impacts of the DA Timber Sale and other sales on late-successional wildlife and wildlife habitat. More specifically, EPIC contends that the FS failed to take a hard look at the cumulative impacts because (1) the FS made conclusions about cumulative impacts even though it did not have adequate information about past timber sales or reasonably foreseeable future timber sales; (2) the FS's determinations about cumulative impacts were conclusory, "providing only generalized statements of impacts," Pl.'s Mot. at 11; and (3) the FS did not consider as part of its cumulative impacts analysis the effects that roads would have. Each argument is addressed below.

However, before addressing each argument, the Court notes briefly that, in mak-

**6.** "The Council of Environmental Quality (CEQ), established by NEPA with authority to issue regulations interpreting it, has promulgated regulations to guide federal agencies in determining what actions are subject to that statutory requirement." *Department of Transp. v. Public Citizen,* 541 U.S. 752, 755– 56, 124 S.Ct. 2204, 2209, 159 L.Ed.2d 60 (2004). The CEQ regulations are entitled to "substantial deference." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 355, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989); *see also Churchill County v. Norton,* 276 F.3d 1060, 1072 n. 7 (9th Cir.2001) (noting same).

ing the above arguments, EPIC criticizes the cumulative impacts analysis provided in not only the EA but also the wildlife specialists' reports underlying the EA. There are three specialists' reports that are relevant:

| NAME | CITATION TO AR | PURPOSE OF REPORT |
|---|---|---|
| Biological Assessment, Divide Auger Timber Sale, Grindstone Ranger District, Mendocino National Forest<br><br>(a.k.a. **Wildlife BA**) | AR 4411–46 | "[T]o analyze the proposed activities associated with the Divide Auger Timber Sale to determine the effects upon federally Threatened and Endangered species [including the northern spotted owl], and to determine whether formal consultation or conferencing with the U.S. Fish and Wildlife Service (FWS) is required." AR 4412 (Wildlife BA). |
| Divide Auger T.S. Effects of Alternatives, Wildlife Specialist's Report<br><br>(a.k.a. **MIS Report**) | AR 4447–84 | To examine the effects of the DA Timber Sale (all three alternatives) on MIS, including the northern spotted owl, goshawk, fisher, and marten. *See* AR 4451 (MIS Report). |
| Biological Evaluation, Divide Auger Timber Sale, Grindstone RD, Mendocino NF<br><br>(a.k.a. **Wildlife BE**) | AR 4530–82 | "[T]o analyze the proposed activities associated with the Divide Auger Timber Sale to determine the effects upon Forest Service Sensitive species [including the goshawk, marten, and fisher], and to determine whether proposed activities would result in a trend toward Forest Service Sensitive species becoming federally listed." AR 4531 (Wildlife BE). |

To the extent the environmental analysis in the EA incorporates and depends upon the analyses in these specialists' reports, the adequacy of the analyses in the specialists' reports must be scrutinized.

 a. *Information About Past and Reasonably Foreseeable Future Timber Sales*

As stated above, EPIC asserts that, because the FS did not have sufficient information about past timber sales or reasonably foreseeable future timber sales, it failed to take a hard look at cumulative effects.

Regarding *past* timber sales, EPIC does not dispute that the FS properly identified such sales. *See* AR 4434 (Wildlife BA; listing past sales that occurred within and 1.3 miles from the proposed DA project); AR 4478 (MIS Report; same); AR 4570 (Wildlife BE; same); *cf. Muckleshoot Indian Tribe v. United States Forest Serv.*, 177 F.3d 800, 809–10 (9th Cir.1999) (stating that an EIS "must 'catalogue adequately the relevant past projects in the area'"); *Lands Council v. Vaught*, 198 F.Supp.2d 1211, 1246 (E.D.Wash.2002) ("[T]he failure to identify [past] projects prevents the decisionmaker from knowing what projects have been included and

therefore from making an informed decision."). Rather, EPIC contends that, even though the FS knew what past sales took place, the agency did not know what the effects of those past sales were. In support, EPIC points to the wildlife specialists' reports, which state that "[i]t is unknown what silvicultural prescriptions were utilized to harvest these [past timber] sales." AR 4434 (Wildlife BA); AR 4478 (MIS Report); AR 4570 (Wildlife BE).

In response, the FS argues that it does not matter what silvicultural prescriptions were actually used to harvest the past timber sales so long as the agency knew what the results of those silvicultural prescriptions were—*i.e.*, how much late-successional forest remained after the sales. *See* 40 C.F.R. § 1508.7 (stating that "[c]umulative impact" is "the impact on the environment which *results* from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions") (emphasis added). The FS asserts that it knew what the results of the past silvicultural prescriptions were based on a table in the MIS Report and a table in the EA. *See* AR 4448–49 (MIS Report; detailing, *inter alia*, the current number of acres for each timber strata in the harvest units for the DA Timber Sale); *see also* AR 4609–10 (EA; same).

The problem for the FS is that, even if these tables reflect how much late-successional forest remained after the sales, they do not provide any "discussion of how [past] projects (and differences between the projects) have harmed the environment." *Lands Council v. Powell*, 379 F.3d 738, 744 (9th Cir.2004). Furthermore, these tables only provide information about late-successional forest for the harvest units of the DA Timber Sale; they say nothing about the results of the past silvicultural prescriptions for land *within* the project/analysis area but *outside* of the

harvest units. The project area is the acreage within the project area boundary, not just the harvested units. The analysis area is the acreage within the project area plus a 1.3–mile radius surrounding the project boundary. *See* AR 4450 (MIS Report; noting that analysis area "acreage is used for those species that are wide ranging"). The entirety of the project/analysis area, not just the harvest units themselves, is relevant to assessment of the impact on late-successional wildlife and wildlife habitat.

At the hearing on the parties' motions for summary judgment, the Court expressly asked the FS for record evidence demonstrating that it considered the effects of the past timber sales for land within the project/analysis area but outside of the harvest units. The FS failed to do so. While the agency claimed that the wildlife specialists made field visits to the project/analysis area, the reports suggest that the specialists looked only at the harvest units themselves, not land outside of the harvest units. *See, e.g.,* AR 4413–14 (Wildlife BA; listing field visits made "to review units and prescriptions"). Similarly, while the reports indicate that the specialists did consider, *inter alia*, aerial photographs and maps of the project/analysis area, again the focus of the specialists was on the harvest units; nothing was said in the reports about the status of late-successional forest in the land outside of the harvest units. *See, e.g.,* AR 4415 (Wildlife BA; discussing timber strata in certain harvest units).

■ Thus, although there is a record of prior harvested areas within the project/analysis area for the DA Timber Sale, the FS failed to conduct the necessary cumulative effects analysis for two reasons. First, the tables reflect only limited information about the areas to be harvested for the DA Timber Sale. *See Lands Council*, 379 F.3d at 745 ("[I]n assessing

cumulative effects, the Environmental Impact Statement must give a sufficiently detailed catalogue of past, present, and future projects, *and* provide adequate analysis about how these projects, and differences between the projects, are thought to have impacted the environment.") (emphasis added). Second, the tables do not in any way provide information about the areas within the DA project/analysis area outside of but proximate to the harvested areas. Because the FS did not have information about the effects of past timber sales on all of the land within the project/analysis area (only the effects within the harvest units for the DA Timber Sale), the Court cannot say that the FS satisfied its duty to take a hard look at the cumulative impacts of the DA Timber Sale along with, *inter alia*, the past timber sales.

Furthermore, the Court concludes that the FS failed to take a hard look at the cumulative effects of the DA Timber Sale and reasonably foreseeable *future* timber sales. As a preliminary matter, the Court acknowledges that, of the four future sales discussed in the wildlife specialists' reports—*i.e.*, Croney Basin, Black Bear, Ball Mountain, and Foreman/Fish—only one appears to qualify as "reasonably foreseeable" because it is a proposed action—*i.e.*, Black Bear. *See Lands Council*, 379 F.3d at 746 ("Our precedent defines 'reasonably foreseeable' in this context to include only 'proposed actions.'"). The Court notes that evidence establishing the status of these sales was only recently provided by

the FS and does not appear to have been part of the administrative record. *See* Def.'s Supp. Br. at 5 & Ex. A. However, the Court shall consider the evidence since there has been no objection by EPIC.[7]

According to EPIC, the FS failed to take a hard look under NEPA because, even though the agency did identify the Black Bear and other future sales, it did not know the number of acres to be harvested for each sale and it did know what silvicultural prescriptions were to be used for each sale. *See* AR 4478 (MIS Report; stating that, for future sales, "[a]cres of harvest and silvicultural treatments have not yet been determined for these projects").

The Court does not accept EPIC's position. The FS cannot be blamed simply because the number of acres to be harvested and the silvicultural prescriptions to be used had not been determined yet for the future sales. Notably, one of the regulations implementing NEPA recognizes that there are circumstances in which information is not complete or is not available to an agency. In such circumstances, the regulation directs that the agency "make clear that such information is lacking." 40 C.F.R. § 1502.22. While this regulation on its face applies to EISs and not EAs, it still provides some guidance to the Court as to whether an agency can be charged with having failed to take a hard look simply because information is incomplete or unavailable.[8]

---

**7.** The Ninth Circuit has said that

> district courts are permitted to admit extra-record evidence: (1) if admission is necessary to determine "whether the agency has considered all relevant factors and has explained its decision," (2) if "the agency has relied on documents not in the record," (3) "when supplementing the record is necessary to explain technical terms or complex subject matter," or (4) "when plaintiffs make a showing of agency bad faith."

*Lands Council*, 379 F.3d at 747.

**8.** This is not to say that § 1502.22 should apply with full force to both EISs and EAs. Section 1502.22 provides that, if the incomplete or unavailable information "is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement." 40 C.F.R. § 1502.22(a). If the information "cannot be obtained because the overall costs of obtaining it are exorbitant or the means to

Although the Court does not accept EPIC's broader argument, it concludes that the FS did not consider all of the information it had about the one reasonably foreseeable future sale at issue (*i.e.,* Black Bear). Ironically, this became clear when the FS submitted the declaration of Jesse Rosenquist for the Court's consideration at the summary judgment hearing. Based on the wildlife specialists' reports, it seemed that the only information the FS had about the future sale was information about its general location. *See* AR 4478 (MIS Report; noting that Black Bear sale was "located over 10 miles southeast" of DA).

The Rosenquist declaration, however, demonstrates that the FS knew more about the future sale than just its general location—in fact, that the agency had information about the tentative project boundary for Black Bear. *See* Rosenquist Decl., Ex. 3(map). But nothing in the EA or wildlife specialists' reports shows that the FS considered the project boundary (and hence size) of the future sale in analyzing cumulative impacts. Nor was the boundary identified in any of the public documents attendant to the EA. This is especially problematic since, if the project boundary for the Black Bear sale was known—even if just tentatively—some assessment about the effect of the future sale could have been made based on, *e.g.,*

the amount of acreage affected, the stand conditions or riparian reserves within the project boundary, and the proximity to habitat of protected or sensitive species.[9]

Thus, because the FS lacked information about the past timber sales and did not consider all of the information it had about the reasonably foreseeable future Black Bear sale, the Court holds that the agency failed to take a hard look at the cumulative impacts of the DA Timber Sale in conjunction with other sales.

As a final point, the Court notes that it is troubled by the cumulative impacts analysis of the FS because it is not clear that the agency necessarily looked at the "incremental impact of the action when *added* to other past, present, and reasonably foreseeable future actions" as required by the regulations implementing NEPA. 40 C.F.R. § 1508.7 (emphasis added). While the wildlife specialists' reports do discuss past, future, and proposed/existing timber sales, the reports discuss the categories of sales separately; that is, the reports do not clearly aggregate the various sales to determine their cumulative impacts. *See, e.g.,* AR 4434–35 (Wildlife BA; addressing consecutively past sales, future sales, and then existing and proposed timber sales). Thus, there is an additional reason why NEPA was violated with respect to cumulative impacts.

obtain it are not known," then the agency must include in the EIS, *inter alia,* a statement that the information is incomplete or unavailable, a statement of the relevance of the information, and a summary of existing credible scientific evidence relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment. *Id.* § 1502.22(b).

This level of detail is unlikely to be required of EAs as opposed to EISs. *See* 51 Fed.Reg. 15,625 (1986) ("It is only appropriate to require this level of analysis when an agency is preparing an EIS. The type of analysis called for in § 1502.22 is clearly more sophisticated

and detailed than the scope of an environmental assessment."). However, the basic principle should still apply.

9. At the summary judgment hearing, the FS pointed out that the Rosenquist declaration and the attached map defining the project boundaries for the future sales was prepared only some forty-eight hours before the hearing. However, the FS did not dispute that it *could* have prepared the map during the NEPA process for the DA Timber Sale. The FS has not demonstrated that the map reflected new information.

b. *Conclusory Cumulative Impacts Analysis*

EPIC argues next that the FS failed to take a hard look at cumulative impacts because the cumulative impacts analysis that it did was overly conclusory. The Ninth Circuit has emphasized that a cumulative impacts analysis cannot be conclusory:

> Consideration of cumulative impacts requires "some quantified or detailed information; ... general statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." The cumulative impact analysis must be more than perfunctory; it must provide a *"useful* analysis of the cumulative impacts of past, present, and future projects."

*Kern,* 284 F.3d at 1075 (emphasis added). Usefulness is the key. *See Muckleshoot,* 177 F.3d at 810 (stating that an environmental analysis "must analyze the combined effects of the actions in sufficient detail to be 'useful to the decisionmaker in deciding whether, or how, to alter the program to lessen cumulative impacts.' "); *Natural Res. Defense Council v. Hodel,* 865 F.2d 288, 298 (D.C.Cir.1988) ("Conclusory remarks [on cumulative impacts] ... do not equip a decisionmaker to make an informed decision about alternative courses of action or a court to review the Secretary's reasoning.").

■ In the instant case, the Court concludes that the cumulative impacts analysis of the FS was conclusory. More specifically, the FS failed to provide a useful cumulative impacts analysis because, even though the agency repeatedly recognized that the DA Timber Sale and/or the other timber sales would fragment habitat for late-successional wildlife (in particular, the northern spotted owl), the agency summarily concluded, without any real expla-nation why, that the fragmentation was not a problem and that there would still be sufficient dispersal habitat after the sales. *See Friends of the Earth, Inc. v. United States Army Corps of Eng'rs,* 109 F.Supp.2d 30, 42 (D.D.C.2000) (noting that the Corps "dedicated nine or ten pages of each EA to cumulative impacts" but that "[t]here is no actual analysis" as the EAs "merely recite the history of development along the Mississippi coast and then conclude that the cumulative direct impacts 'have been minimal' "); *see also Yolano–Donnelly Tenant Ass'n v. Cisneros,* No. S–86–846 MLS PAN, 1996 U.S. Dist. LEXIS 22778, at *42–43 (E.D.Cal. Mar. 8, 1996) (criticizing EA because it was "full of conclusory language and provides virtually no factual support for its analyses and conclusions"; adding that "conclusory statements of reasons supporting HUD's finding is clearly at odds with NEPA's mandate"); *cf. National Wildlife Fed'n v. National Marine Fisheries Serv.,* 235 F.Supp.2d 1143, 1159–60 (W.D.Wash.2002) (in Endangered Species Act case, stating that, "[d]ue to [the agency's] failure to explain [in its biological opinion] how dredging in the Snake River Fall Chinook's critical habitat will not adversely modify that habitat, its action appears to be arbitrary and capricious").

For example, in the EA, the FS admits that the DA Timber Sale and other sales will fragment habitat for mid- and late-successional wildlife by reducing suitable nesting, denning, and dispersal habitat for such wildlife; the agency also emphasizes that dispersal habitat between large LSRs and the 100 acre LSRs is "important to maintain." AR 4646(EA). However, the FS then goes on to conclude—without any explanation why—that the DA Timber Sale and other sales would "still allow protected movement." AR 4646(EA).

There are similar conclusory statements in the wildlife specialists' reports underlying the EA. In the Wildlife BA, for instance, the specialist acknowledges that the DA Timber Sale, by removing five acres of suitable nesting/roosting habitat and 154 acres of suitable foraging/dispersal habitat for the northern spotted owl, "could limit the availability of nesting sites, cause further fragmentation within the analysis area, and reduce the availability of dispersal habitat for juvenile young owls. Fragmentation would increase the probabilities of predation on spotted owls [as][s]potted owl young and adults may come into contact with predators (great horned owls, goshawks, etc.) more often in fragmented environments." AR 4425 (Wildlife BA); *see also* AR 4428 (Wildlife BA; same). The specialist later states that the cumulative harvesting of existing and proposed timber sales will cause fragmentation of habitat for the northern spotted owl; that most matrix land will continue to be harvested such that it will not reach suitability as nesting habitat; and that, even though the Buttermilk LSR was considered fully functional in the most recent LSR Assessment, dispersal habitat between 100 acre LSRs and large LSRs is important to maintain and critical areas to maintain adequate dispersal habitat into the future will be between the Buttermilk LSR and YBME Wilderness. *See, e.g.,* AR 4435 (Wildlife BA). After stating all of this, the specialist then concludes—without any explanation or analysis—that "[t]his area [between the LSR and Wilderness] would continue to provide dispersal habitat after implementation of this project." AR 4435 (Wildlife BA).

As another example, in the Wildlife BA, the specialist recognizes that the DA Timber Sale will impact at least some of the owl activity centers in the project area, for example, activity center 1008, which is located between the YBME Wilderness and Buttermilk LSR. Dispersal from this activity center takes place north to the Wilderness and south to the LSR. *See* AR 4426 (Wildlife BA). The home range for 1008 consists of only 835 acres, far less than the minimum 1,336 acres recommended by the FWS to support a pair of nesting owls. With the DA Timber Sale, 100 more acres of foraging/dispersal habitat would be removed from the home range. *See* AR 4424, 4426 (Wildlife BA). Given these circumstances, the specialist concedes that "harvesting would fragment habitat" but then concludes—without any explanation—that "suitable dispersal would still exist to allow protected movement." AR 4426 (Wildlife BA).

For further examples of conclusory statements in the wildlife specialists' reports, see AR 4434 (Wildlife BA; noting that future Croney Basin sale "could potentially affect" owl activity center 1052, also located directly between the YBME Wilderness and Buttermilk LSR, "if suitable habitat is removed" but then concluding—without providing any reasoning—that "[t]he addition of this sale should not effect dispersal between [the Buttermilk LSR] and Yolla Bolly Wilderness"); AR 4466 (MIS Report; noting that southern part of the project area has "small, isolated patches of suitable habitat" and that harvesting in one southern harvest unit will "remove foraging habitat within the largest contiguous block" but then concluding—without explanation—that "dispersal would not be inhibited"); AR 4467 (MIS Report; taking note that the DA Timber Sale will fragment foraging/dispersal habitat, including that between the Wilderness and LSR, but concluding—without explaining why—that "suitable habitat would still exist to allow protected movement" and that, "[a]lthough reduced, dispersal habitat would still exist").

At the hearing on the motions for summary judgment, the Court pressed the FS

to explain the basis of its conclusion that fragmentation would not be a problem given the findings of risk identified in the EA and wildlife specialists' reports. Notably, the FS responded first by admitting that the analysis in the EA and reports "sounds conclusory" before arguing that its conclusion was based on field visits made by the specialists as well as quantitative data.

The FS's argument is not persuasive. Even though the specialists appeared to have made field visits to the project area, that does nothing to explain the substantive basis of their conclusion, e.g., that sufficient dispersal habitat would remain even after the DA Timber Sale and other sales. As for quantitative data, the MIS Report does reflect the size of the habitats for the northern spotted owl, goshawk, marten, and fisher in the project/analysis area. See AR 4466–67 (stating that, for southern part of project, "[s]potted owl and goshawk habitat is mostly divided into one large patch, approximately 280 acres in size, and two smaller patches approximately 135 acres each" and "[m]arten and fisher habitat is divided into one large patch of 250 acres in size, and two smaller patches approximately 70 and 140 acres, as well as smaller isolated patches"; for northern part, "[a]lthough convoluted, the mid to late successional habitat is spread throughout the project area and is fairly contiguous"). But the size of the habitats does little to explain again *how* sufficient dispersal habitat would remain after the DA Timber Sale, let alone the DA Timber Sale when taken in conjunction with other sales. For example, how did the FS or the specialists determine that removal of 59 and 100 acres respectively from the southern and northern portions of the project area was a negligible amount for purposes of dispersal? *Cf. Marble Mountain Audubon Society v. Rice*, 914 F.2d 179, 182 (9th Cir.1990) (holding that FS failed to take a hard look at impact of timber sale on biological corridor; stating that "the FEIS

concludes, without any apparent study or supporting documentation, that the preservation of a 1/2–mile wide strip bisecting the drainage will be sufficient to maintain the corridor"). The Court therefore finds the FS's cumulative impacts analysis was too conclusory. The conclusory analysis in the EA and wildlife specialists' reports fail to establish the hard look required of the agency in assessing cumulative impacts.

### c. *Effects of Roads*

EPIC argues that the FS also failed to take a hard look at the cumulative impacts on late-successional wildlife and wildlife habitat because the EA and wildlife specialists' reports did not address the effects of roads as part of the cumulative impacts analysis. EPIC asserts that "road densities are of documented importance to the viability of late-successional wildlife," Pl.'s Opp'n at 4, and notes that, according to the Wildlife BE, current road densities are approximately five miles per square mile, which falls under low quality habitat for both the marten and fisher. See AR 4547, 4550 (Wildlife BE).

EPIC is correct that road densities are important to the viability of late-successional wildlife. The LSR Assessment, for example, notes that "[r]oad densities can affect habitat quality for many species, including marten, fisher, nesting owls, goshawks, and other species. Roads affect the quality of late successional habitat by increasing erosion, exposing animals to predation, and increasing noise disturbance." AR 3376 (LSR Assessment).

While the FS does not really dispute the significance of road densities, it still argues that it did not have to discuss the influence of roads as part of the cumulative impacts analysis because the DA Timber Sale will not involve any road construction, only road maintenance. See AR 4593(EA); AR 4415 (Wildlife BA). Under the FS Hand-

book, road maintenance may be categorically excluded from documentation in an EA. *See* Forest Service Handbook 1909.15, at §§ 30.3(1), 31.1b (stating that "[r]epair and maintenance of roads, trails, and land-line boundaries" may be categorically excluded); *see also* SAR 2 (road repair and maintenance proposal, dated 11–08–98; stating that project falls within category of actions for which no formal documentation required). " 'Categorical exclusion' means a category of actions which do not individually *or* cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations (§ 1507.3). . . ." 40 C.F.R. § 1508.4 (emphasis added).

The problem with this argument is that the FS Handbook states that there may be a categorical exclusion only when there are no extraordinary circumstances related to the proposed action. "Extraordinary circumstances include, but are not limited to, the presence of . . . threatened and endangered species or their critical habitat." Forest Service Handbook 1909.15, at § 30.3(2)(b). In the instant case, the goshawk, marten, and fisher are only sensitive species, *see* AR 4531 (Wildlife BE), but the northern spotted owl is a threatened/endangered species. *See* AR 4412 (Wildlife BA). Thus, it would appear that the categorical exclusion would not apply to the assessment of impacts on the northern spotted owl.

■ Even if the categorical exclusion did not apply, the Court finds that the FS's analysis was not deficient. To be sure, the FS's cumulative impacts analysis did, in a formal sense, omit consideration of roads. In the various sections titled "cumulative effects" (whether in the EA or the wildlife specialists' reports), the FS and/or specialists do not engage in any discussion of roads. However, the FS

and/or specialists cannot be said to have ignored the effects of roads because those effects are discussed in other sections. *Cf. City of Carmel–by–the–Sea v. United States Dep't of Transp.,* 123 F.3d 1142, 1160 (9th Cir.1997) (noting that EIS considered impacts on certain resources in "individual sections dealing with each resource, and collectively in a section entitled 'Environmental Consequences: Cumulative Impacts'" but that these analyses "taken either separately *or* together . . . fail to provide sufficient information to satisfy" NEPA) (emphasis added). For example, the Wildlife BA discusses as part of its direct effects analysis whether road maintenance and other road activity will have a significant effect on northern spotted owls in terms of noise disturbance. *See* AR 4427 (Wildlife BA).

While the EA and wildlife specialists' reports do not discuss roads in terms of potential habitat fragmentation, the DA Timber Sale will not involve any new road construction. Rather, the sale will involve the maintenance of eighteen miles of existing roads, grading of two additional miles, and construction of 0.25 miles of temporary spur roads which will be closed immediately after harvest. *See* AR 4593(EA); AR 4415 (Wildlife BA). "All of these roads . . . [will] not require removal of additional timber." AR 4415 (Wildlife BA). Because there will be no new road construction with the DA Timber Sale and the road activity under the sale will not require the removal of additional timber, there will be no increase in road densities and thus EPIC has not demonstrated that there is a substantial risk of habitat fragmentation to the northern spotted owl. *Cf.* 40 C.F.R. § 1502.2 ("Impacts shall be discussed in proportion to their significance. There shall be only brief discussion of other than significant issues. As in a finding of no significant impact, there should

be only enough discussion to show why more study is not warranted.").

For the foregoing reasons, the Court holds that the FS did not improperly omit discussion of the effects of roads as part of its analysis of impacts and thus did not violate NEPA in this regard.

### 2. *Convincing Statement of Reasons for FONSI*

■■■■ NEPA requires that an EIS be prepared for all "major Federal actions significantly affecting the ... environment." 42 U.S.C. § 4332(2)(C). However, in certain circumstances, *see, e.g.,* 40 C.F.R. § 1501.4 (if an agency's regulations do not categorically require the preparation of an EIS), agencies may first prepare an EA to make a preliminary determination whether the proposed action will have a significant environmental effect. *See National Parks & Conservation Ass'n v. Babbitt,* 241 F.3d 722, 730 (9th Cir.2001). "If the EA establishes that the agency's action *may* have a significant effect upon the ... environment, an EIS must be prepared." *Id.* (emphasis in original; internal quotation marks omitted). More specifically,

> an EIS *must* be prepared if substantial questions are raised as to whether a project ... *may* cause significant degradation to some human environmental factor. To trigger this requirement, a plaintiff need not show that significant effects *will in fact occur* [;] raising substantially questions whether a project may have a significant effect is sufficient.

*Idaho Sporting Cong. v. Thomas,* 137 F.3d 1146, 1149–50 (9th Cir.1998) [hereinafter *Thomas* ] (emphasis in original; internal quotation marks omitted). If the EA does not establish that the action may have a significant effect, then the agency must issue a FONSI, "accompanied by a convincing statement of reasons to explain why a project's impacts are insignificant." *National Parks,* 241 F.3d at 730 (internal quotation marks omitted). "The statement of reasons is crucial to determining whether the agency took a hard look at the potential environmental impact of a project." *Save the Yaak,* 840 F.2d at 717 (internal quotation marks omitted). Thus, a court should defer to an agency's decision only when it is " 'fully informed and well-considered.' " *Id.*

According to the CEQ regulations, " '[s]ignificantly' as used in NEPA requires considerations of both context and intensity." 40 C.F.R. § 1508.27. Context "means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality." *Id.* § 1508.27(a). Intensity "refers to the severity of an impact." *Id.* § 1508.27(b). Factors that should be considered in evaluating intensity include:

> (3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.
>
> . . . . .
>
> (7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.
>
> . . . . .
>
> (10) Whether the action threatens a violation of Federal, State, or local law

or requirements imposed for the protection of the environment. *Id.* § 1508.27(b)(3), (7)(10).

EPIC argues that the FS's assessment of significance was flawed in three ways: (1) because the FS did not take a hard look at the cumulative impacts on late-successional wildlife and wildlife habitat, *see id.* § 1508.27(b)(7); (2) because the FS did not adequately take into account the ecologically critical area between the YBME Wilderness and Buttermilk LSR, where the project area is located, *see id.* § 1508.27(b)(3); and (3) because the DA Timber Sale threatens a violation of federal law, namely, NFMA which imposes a duty on the FS to ensure the diversity and viability of species. *See id.* § 1508.27(b)(10). EPIC's first argument has already been addressed above. *See* Part III.A, *supra.* EPIC's remaining arguments are addressed below.

### a. *Area Between YBME Wilderness and Buttermilk LSR*

As noted above, the regulations implementing NEPA provide that one of the factors for an agency to consider in assessing significance is the "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas." 40 C.F.R. § 1508.27(3). According to EPIC, the project area for the DA Timber Sale is an ecologically critical area—in particular, the northern part which is located directly between the YBME Wilderness and Buttermilk LSR. EPIC asserts that this area provides "key ecological and biological connectivity between the Wildernesss and the LSR." Pl.'s Mot. at 21.

In response, the FS argues that the project area is not critical for connectivity. Relying on the most recent LSR Assessment, the FS contends that the key areas for connectivity are the riparian reserves

to the west of the project area (along the Middle Ford Eel River) and certain northern spotted owl activity centers, none of which are implicated in the DA Timber Sale. *See* AR 3411, 3452–54 (LSR Assessment). In addition, the FS relies on the Wildlife BA, which states that "Critical Habitat does not exist within the project boundary, [although] it does exist immediately adjacent along the southern boundary of the north portion ([Buttermilk LSR])." AR 4423 (Wildlife BA).

 The FS's argument is not persuasive. First, as one appellate court has recognized, simply because an area is not designated as critical habitat does not mean that its potential destruction should not be considered significant for purposes of NEPA. *See Greater Yellowstone Coalition v. Flowers*, 359 F.3d 1257, 1275 (10th Cir.2004) (noting that "the record clearly establishes that this stretch of the Snake River has long been an important and productive bald eagle nesting territory").

Second, the LSR Assessment defines a fully functional LSR as not only one that "contain[s] well connected late successional habitat" but also one that is *"connected* to other LSRs through dispersal habitat for both aerial and ground traversing species." AR 3360 (LSR Assessment; emphasis added). Based on this definition, the project area would appear to be important to connectivity since activity centers 1008 and 1052 (as well as 1001) are located in close proximity to the Buttermilk LSR. *See* Docket No. 40(map); AR 4583(map).

Third, while the LSR Assessment does acknowledge that the riparian reserves to the west "will be important for connectivity between [the Buttermilk] LSR and the [YBME] wilderness," it does not state that the other areas (such as the project area) are meaningless or do not provide important connectivity. AR 3411 (LSR Assessment).

Finally, while the owl activity centers encompassed in the project area (*e.g.*, 1008 and 1052) are not identified in the LSR Assessment as providing "critical connectivity," AR 3452–54 (LSR Assessment), the wildlife specialists' reports suggest that the area is important to connectivity. For example, in the section on cumulative effects, the Wildlife BA states: "[R]emoval of key dispersal habitat between the 100 acre LSR's and the large LSR's would adversely affect the ability of young owls to safely leave their natal areas. Critical areas to maintain adequate dispersal habitat into the future would be between [the Buttermilk LSR] and the Yolla Bolly Wilderness. This area would continue to provide dispersal habitat after implementation of this project [*i.e.*, the DA Timber Sale]." AR 4435 (Wildlife BA); *see also* AR 4479 (MIS Report; same); AR 4571 (Wildlife BE; same). The Wildlife BA also states: "[The Buttermilk LSR] and the Yolla Bolly Wilderness are separated by .75 mile[s] of Matrix land. Activity center 1052 is located directly between the Yolla Bolly Wilderness boundary and is .5 mile[s] from [the Buttermilk LSR]. Removal of 67 acres of foraging and dispersal habitat from [Harvest] Units 19, 20, 21, and 22 [within the home range of 1052] could effect direct dispersal between these areas." AR 4427 (Wildlife BA).

Consequently, the record in the instant case suggests that the project area for the DA Timber Sale may play an important role to connectivity. Furthermore, the record indicates that, at the very least, the FS *did* consider the project area important to connectivity—the agency simply determined in the end that there would be no significant effects. *See, e.g., Indiana Forest Alliance, Inc. v. United States Forest Serv.*, No. NA 99–214–C H/G, 2001 WL 912751, at *13, 2001 U.S. Dist. LEXIS 11996, at *44 (S.D.Ind. July 5, 2001) (stating that, although plaintiff identified certain unique characteristics of the property

such as its karst features, plaintiffs did not show FS "unreasonably concluded that the forest openings maintenance project will not significantly affect any of them"; "mere presence of unique features does not require ... preparation of an EIS"), *aff'd*, 325 F.3d 851 (7th Cir.2003); *cf. Presidio Golf Club v. National Park Serv.*, 155 F.3d 1153, 1162 (9th Cir.1998) (holding that Park Service did take into account proximity to historical resources and that EA was replete with considerations of unique characteristics of Presidio and its ecological resources). Thus, to the extent EPIC argues that the FS did not even recognize that the DA Timber Sale affected an important ecological area, EPIC is wrong. However, EPIC additionally argues that the FS improperly concluded that there would be no significant effects to this important ecological area. It is in this regard that the FS's EA is problematic.

As discussed in Part III.A.2, *supra*, the FS's explanation as to why there would be no significant effects was conclusory. The FS did not explain, *e.g.*, why there would still be sufficient dispersal habitat after the DA Timber Sale and/or other sales, thus failing to provide a convincing statement of reasons to support the FONSI. *Cf. Blue Mts. Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1213–14 (9th Cir.1998) ("The EA's cursory and inconsistent treatment of sedimentation issues, alone, raises substantial questions about the project's effects on the environment and the unknown risks to the area's renowned fish populations.").

While the FS contends that the riparian reserves to the west of the DA Timber Sale provide connectivity between the Buttermilk LSR and YBME Wilderness, there is little analysis of the relative importance as between those reserves and the project area to overall connectivity. As noted

above, the geographic proximity of the project area and the wildlife specialists' reports strongly suggest that the project area plays an important role in habitat connectivity. The EA contains no comparative analysis of the importance of the project area relative to the riparian reserves and risk of overall impact to connectivity resulting from the sale. There is no detailed showing that the effect of the DA Timber Sale on connectivity overall will be insignificant.

The FS largely defends its position by arguing that, while there might be some adverse effects as a result of the sale, "EPIC ignores scientific evidence that failing to harvest timber in the northern Divide Auger units will fragment habitat even further." D's Opp'n at 9; see also Wetlands Action Network v. United States Army Corps of Eng'rs, 222 F.3d 1105, 1120–21 (9th Cir.2000) (stating that, "when the record reveals that an agency based a finding of no significant impact upon relevant and substantial data, the fact that the record also contains evidence supporting a different scientific opinion does not render the agency's decision arbitrary and capricious"). More specifically, the FS points out that the northern part of the project area is plagued by the H. annosum fungus and that, if these harvest units are not treated, they, "as well as the other northern units, would become unsuitable as foraging and dispersal habitat in the immediate future and the disease may spread outside the harvested boundaries." AR 4427–28 (Wildlife BA). This argument is, in essence, that the benefits of the DA Timber Sale will outweigh any adverse effects.

The problem with this argument is that, "[a] significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial." 40 C.F.R. § 1508.27(b)(1). In Friends of Fiery Gizzard v. Farmers Home Admin., 61 F.3d

501 (6th Cir.1995), the Sixth Circuit noted that, "[w]here [significant] adverse effects can be predicted, and the agency is in the position of having to balance the adverse effects against the projected benefits, the matter must, under NEPA, be decided in light of an environmental impact statement." Id. at 505 (emphasis added); see also Border Power Plant Working Group v. Department of Energy, 260 F.Supp.2d 997, 1023 n. 22 (S.D.Cal.2003) ("Although it appears that the treatment of water to be used in the plants will remove contaminants in the water and improve the biological and chemical quality of the New River, these welcome benefits do not in some way negate the agencies' duty to separately analyze the negative impacts on water flow and salinity.").

The Court therefore concludes that the FS violated NEPA because, even though it did recognize that the project area was important to connectivity, its determination that there would be no significant effect to the area was conclusory, thus providing no convincing statement of reasons in support of the FONSI.

### b. Threatened Violation of NFMA

EPIC also argues that the FS's assessment of significance was flawed because the DA Timber Sale threatens a violation of NFMA which imposes a duty on the FS to ensure the diversity and viability of species. Whether or not there was actually a violation of NFMA is discussed in Part III.E, infra. The question here, of course, is somewhat different as NFMA involves the FS's substantive duties and NEPA its procedural duties.

 NEPA requires that, in assessing whether proposed action would have a significant impact, the agency must consider the threat that substantive environmental laws will be violated. See 40 C.F.R. § 1508.27(b)(10). See Sierra Club v. Unit-

ed States Forest Serv., 843 F.2d 1190, 1195 (9th Cir.1988)(noting that 40 C.F.R. § 1508.27(b)(10) requires the FS "to consider state requirements imposed for environmental protection to determine whether the action will have a significant impact on the human environment" but "[n]owhere do the EAs mention the impact of logging upon California's water quality standards"). However, contrary to what EPIC suggests, this is not a situation in which the agency was unaware of its duty to comply with federal law, i.e., NFMA. The MIS Report alone demonstrates that the FS was cognizant of its obligation to ensure diversity and viability of species in the MNF. See AR 4447 et seq. (MIS Report); see also AR 4664 (EA; noting that diversity and viability are addressed in various wildlife specialists' reports). Further, the EA reflects the FS's understanding of its need to abide by the MNF Plan and NW Forest Plan. See AR 4594 (EA; discussing forest plans); 16 U.S.C. § 1604(i) ("Resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans.").

EPIC contends still that, even if the FS was aware of its duty to comply with the NFMA, the agency confused this *substantive* duty with its *procedural* duty to comply with NEPA. According to EPIC, "[e]ven if the agency has fully complied with its substantive duties, ... this does not render environmental impacts—in particular[,] cumulative impacts—'insignificant' and does not absolve the agency from its NEPA duties." Pl.'s Mot. at 19. EPIC continues: "This is particularly so in this case because the substantive thresholds established by NFMA and the Forest Plan are much *higher* than the 'may have a significant effect' standard established for NEPA's significance threshold." Pl.'s Mot. at 19.

The Court does not dispute that the FS's duties with respect to NFMA and NEPA are different; however, there is little support for EPIC's argument. The FS did not conclude that, because it had complied with NFMA and the MNF Plan, there would be no significant effects to late-successional wildlife and wildlife habitat. Rather, its conclusion was based on the (albeit flawed) cumulative effects analyses in the EA and wildlife specialists' reports. See AR 4646(EA).

The fact that, in the EA, the FS used the word "viability" in its discussion of cumulative impacts does not necessarily imply that the agency confused its substantive duties under NFMA with its procedural duties under NEPA—i.e., requiring a threat to the viability of the species before it could find a likely significant effect warranting an EIS. See AR 4646 (EA; noting that EIS for the NW Forest Plan "determined that[,] when the LSR's were fully functional, matrix acres were not required to support the LSR's and would not affect the viability of these species across their range"). The FS's reference to viability was entirely sensible when, e.g., addressing the degree to which its action might adversely effect endangered or threatened species under the Endangered Species Act, a consideration required under 40 C.F.R. § 1508.27(9). See AR 4647–48 (EA; discussing viability of, e.g., northern spotted owl, bald eagle, and red-legged frog). In any event, when reviewing the entire EA in its context, the Court concludes that the FS did not confuse its substantive duties under NFMA with its procedural duties under NEPA.

### 3. Reasonable Range of Alternatives

EPIC's third argument is that the FS violated NEPA because it did not consider a reasonable range of alternatives in the EA. As discussed above, the FS discussed

three alternatives in the EA: (1) Alternative A, which was the "no action" alternative; (2) Alternative B, which involved logging in the southern units only; and (3) Alternative C (the proposed action), which involved logging in both the northern and southern units. According to EPIC, this was not a reasonable range of alternatives because it did not include an alternative in which there was no commercial logging and which was restoration based (thus distinguishing it from the "no action" alternative).

NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). The regulations implementing NEPA make clear that an agency must consider alternatives in an EIS. *See* 40 C.F.R. § 1502.14 (stating that section on alternatives is the "heart" of an EIS). The same is true with respect to an EA. *See id.* § 1508.9(b) (stating that an EA "[s]hall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted"); *see also Bob Marshall Alliance v. Hodel,* 852 F.2d 1223, 1228–29 (9th Cir.1988) (stating that consideration of alternatives is critical to goals of NEPA even where proposed action does not trigger EIS process); *Akiak Native Community v. United States Postal Serv.,* 213 F.3d 1140, 1148 (9th Cir.2000) (noting that an EA must consider a reasonable range of alternatives). Because alternatives are an important consideration in an

EA as well as an EIS, the Court takes guidance from case law discussing alternatives with respect to an EIS, not just an EA.[10]

■ In *Westlands,* the Ninth Circuit established the legal framework for analyzing whether an agency has considered a reasonable range of alternatives as part of its environmental analysis. Because the stated goal of a project dictates the range of reasonable alternatives, a court must first determine whether the purpose and need statement for the agency action was reasonable. *See Westlands,* 376 F.3d at 865. A purpose and need statement will be considered unreasonable if the agency defined its objectives in unreasonably narrow terms. *See id.* As noted by the D.C. Circuit, "an agency may not define the objectives of its action in terms so unreasonably narrow that only one alternative ... would accomplish the goals of the agency's actions, and the EIS [or EA] would become a foreordained formality." *Citizens Against Burlington, Inc. v. Busey,* 938 F.2d 190, 196 (D.C.Cir.1991).

■ If the purpose and need statement was reasonable, the court must then determine whether the range of alternatives in the environmental analysis was reasonable. The "rule of reason" is used to make this determination. Under the rule of reason, an agency need not consider a minimum number of alternatives, *see Laguna Greenbelt, Inc. v. United States Dep't of Transp.,* 42 F.3d 517, 524 (9th Cir.1994), nor must it consider an "infinite range of alternatives." *Westlands,* 376 F.3d at 868. Rather, an agency must only take into account feasible alternatives.

---

**10.** The discussion of alternatives in an EIS, however, may be more rigorous than that in an EA. *Compare* 40 C.F.R. § 1502.14 (stating that an EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were elimi-

nated from detailed study, briefly discuss the reasons for their having been eliminated"), *with id.* § 1508.9(b) (stating that an EA "[s]hall include brief discussions ... of alternatives").

*See id.; see also Vermont Yankee Nuclear Power Corp. v. Natural Res. Defense Council, Inc.,* 435 U.S. 519, 551, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) (noting that the concept of alternatives under NEPA is "bounded by some notion of feasibility"). Because alternatives must be feasible, an agency does not have to include, *e.g.,* alternatives that are remote or speculative or whose effects cannot be readily ascertained. *See Westlands,* 376 F.3d at 868; *Laguna Greenbelt,* 42 F.3d at 525. In contrast, "[a] viable but unexamined alternative renders [an environmental analysis] inadequate." *Muckleshoot,* 177 F.3d at 813 (internal quotation marks omitted). However, even though alternatives must be feasible, the agency need not consider every feasible alternative; for instance, an agency is not "required to undertake a 'separate analysis of alternatives which are not significantly distinguishable from alternatives actually considered, or which have substantially similar consequences.'" *Westlands,* 376 F.3d at 868.

▮ Ultimately, the rule-of-reason standard "requires an agency to set forth only those alternatives necessary to permit a reasoned choice." *Tillamook County v. United States Army Corps of Eng'rs,* 288 F.3d 1140, 1144 (9th Cir.2002). " 'The

touchstone … is whether [the] selection and discussion of alternatives fosters informed decision-making and informed public participation.' " *Westlands,* 376 F.3d at 868; *see also* 40 C.F.R. § 1502.14 (stating that alternatives "sharply defin[e] the issues and provid[e] a clear basis for choice among options by the decisionmaker and the public").

### a. Purpose and Need Statement

As noted above, *see* pages 6–7, *supra,* the EA for the DA Timber Sale articulated four different purposes and needs, including a logging purpose. *See* AR 4594–95(EA). At the hearing on the motions for summary judgment, EPIC did not really challenge these purposes and needs as unreasonable, not even the logging purpose.[11] In fact, EPIC stated at the hearing that, if the only purpose for the DA Timber Sale was a logging purpose, then the range of alternatives in the EA would be proper; but, because the FS identified other purposes in addition to a logging purpose, it should have considered a noncommercial logging, restoration-based alternative. The Court therefore turns its attention to the second stage of the analysis required by *Westlands.*

11. This is only sensible since the MNF Plan contemplates logging in the management area where the DA Timber Sale is to take place. *See* AR 2079 (MNF Plan; designating more than 4,000 acres in Management Area # 35 "timber modified"); AR 4594 (EA; noting "timber modified" requirement for Management Area # 35 in statement of purpose and need). Notably, in *Muckleshoot,* the Ninth Circuit concluded that an EIS's stated purpose (to " 'consolidate ownership and enhance future resource conservation and management by exchanging parcels of National Forest System and Weyerhaeuser [a private company] land' ") was not overly narrow because it incorporated the forest plan's stated purpose (" 'creating consolidated land ownership patterns where consistent management

mandates, policies and objectives apply across large blocks of land' "). *Muckleshoot,* 177 F.3d at 813. Given the nature of the statement held reasonable in *Muckleshoot,* the district court in *Kettle Range Conservation Group v. United States Forest Serv.,* 148 F.Supp.2d 1107 (E.D.Wash.2001), concluded that the inclusion of a timber purpose was not overly narrow: "[T]he statement of purpose in this case, while it presupposes an element of logging, does not restrict the Project to logging at a minimum number of board feet or engaging in a particular transaction. Rather, the statement of purpose leaves considerable room for the development of alternatives with varying degrees of timber harvest." *Id.* at 1118.

b. *Range of Alternatives*

First, EPIC suggests that the EA was inadequate because a noncommercial, restoration-based alternative was not considered even though it was viable. The FS, however, did give consideration to this alternative because the alternative was raised in a public comment. *See* AR 4654 (EA; public comment claiming that "[t]he EA fails to provide an alternative that does not involve logging old-growth forest to meet the stated purpose and need for action[;] [u]nderstory thinning of small diameter trees could address all of the identified needs without causing significant impact"). The FS simply rejected it after a brief explanation, which, under the regulations, it was entitled to do. *See* 40 C.F.R. § 1502.14(a) (stating that, "for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated"). Courts have held that an agency may address an alternative in a public comment. *See Natural Res. Defense Council v. Hodel*, 865 F.2d 288, 296 (D.C.Cir.1988) (indicating that discussion of alternatives may be adequate because of inclusion of interested parties' comments and government's responses); *see also Westlands*, 376 F.3d at 870 (noting that "[t]he record shows that the EIS team considered and directly responded to suggestions" made by commentators regarding alternatives).

However, even if addressing an alternative in a public comment were not sufficient, the FS was not required to consider the noncommercial, restoration-based alternative supported by EPIC because the range of alternatives in the EA was sufficient to permit the FS to make a reasoned choice. *See id.* at 868 (emphasizing that the "touchstone" is whether the selection and discussion of alternatives fosters informed decision-making and informed public participation). Alternative B in the EA, while it did permit logging in the southern units, took a noncommercial, restoration-based approach for the northern units, just as advocated by EPIC. *Cf. id.* at 870 (rejecting plaintiffs' argument that alternatives were inadequate because they failed to consider flow options along with other non-flow measures; record demonstrated that non-flow measures were part of each alternative considered). The FS provided specific reasons as to why Alternative B was not workable. Its analysis would logically carry over and lead to the same conclusion for an alternative that was completely noncommercial and restoration based (*i.e.,* no logging in either the northern or southern units). *See id.* at 868 (stating that an agency is not "required to undertake a 'separate analysis of alternatives which are not significantly distinguishable from alternatives actually considered, or which have substantially similar consequences'"); *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1520 (9th Cir.1992) (noting that "[t]he inclusion of alternatives similar to the one put forward by plaintiffs was held sufficient by the [Ninth Circuit]"); *Northern Plains Resource Council v. Lujan*, 874 F.2d 661, 666 (9th Cir.1989) ("NEPA does not require a separate analysis of alternatives with consequences indistinguishable from the action proposed....").

Furthermore, the noncommercial, restoration-based alternative proposed by EPIC was not consistent with two of the purposes for the proposed action. As discussed above, there were four purposes and needs for the DA Timber Sale: (1) to provide an adequate timber supply that contributes to economic stability of rural communities; (2) to minimize the spread of insects and disease; (3) to increase the presence of mixed conifers and encourage the growth of oak; and (4) to reduce natural fuels (*i.e.,* intensity of future wildfires). The noncommercial, restoration-based alternative clearly was not consistent with

the first purpose. It was also inconsistent with the second purpose. EPIC wanted "a noncommercial, restoration based alternative that relied on understory thinning of small diameter trees to respond to insect and disease concerns and high fuel loads and fire risk." P's Mot. at 25. However, as explained in the EA,

[p]re-commercial thinning to reduce the spread of *H. annosum* has not been successful in reducing the spread of the disease. Research has shown that simply thinning the understory in a two-story stand does little to slow the spread of the disease. The spread of *H. annosum* from root to root contact may be possibly avoided by maintaining an even-aged stand where trees are spaced greater than 6m (approximately 20 feet) away from other trees. However, in the northern portion of the sale, pre-commercial thinning the understory trees will not result in 20 foot spacing between overstory trees. Minimizing root-to-root spread of the disease could only be accomplished by commercial thinning overstory trees and the removal of most second story trees.

AR 4615(EA).

At the summary judgment hearing, EPIC contested the accuracy of this scientific analysis. However, the Court cannot conclude that the FS acted arbitrarily or capriciously simply because the agency and EPIC have a disagreement about the science involved. *See Westlands*, 376 F.3d at 871 (taking note of agency's technical expertise and experience with respect to questions involving scientific matters); *see also Wetlands Action Network*, 222 F.3d at 1120–21 (stating that, "when the record reveals that an agency based a finding of no significant impact upon relevant and substantial data, the fact that the record also contains evidence supporting a different scientific opinion does not render the agency's decision arbitrary and capricious").

EPIC protests, however, that the FS could not decline the noncommercial, restoration-based approach "simply on the grounds that it is not a 'complete solution' to the agency's goals," P's Mot. at 27 (quoting *Natural Res. Defense Council v. Morton*, 458 F.2d 827, 836 (D.C.Cir.1972)), and the alternatives in the EA were skewed in favor of logging. Again, these arguments are not convincing. First, the D.C. Circuit limited the reach of *Morton* in a subsequent case, *City of Alexandria v. Slater*, 198 F.3d 862 (D.C.Cir.1999). In *City of Alexandria*, the court stated that *Morton* simply stood for the proposition that a reasonable alternative is defined by reference to a project's objectives and that a broad articulation of reasonable alternatives was compelled in *Morton* because of the national scope of the problem to be addressed. *See id.* at 868–69. Notably, other courts have held that an alternative may be rejected because it does not meet the stated purposes and needs for the proposed action. *See, e.g., Hells Canyon Alliance v. United States Forest Serv.*, 227 F.3d 1170, 1181 (9th Cir.2000) (stating that alternative proposed by plaintiff would not have met goal of striking balance between recreational and ecological values); *Seattle Audubon Soc'y v. Moseley*, 80 F.3d 1401, 1404 (9th Cir.1996) (noting that no harvest alternative was part of the preliminary discussion but abandoned because it was inconsistent with the purpose/need to find a balance between competing uses); *Utah Envtl. Cong. v. Bosworth*, 285 F.Supp.2d 1257, 1274 (D.Utah 2003) (noting that project had two purposes, *i.e.*, to reduce spread of insects and provide timber; "an alternative proposing 'no timber harvest' would not meet the primary or secondary purpose of the project"). In this case, the alternative advanced by EPIC would not meet two of the four purposes of the DA

Timber Sale.[12]

Second, this case is not comparable to those in which courts have found the alternatives skewed in favor of a certain result. *See, e.g., Muckleshoot,* 177 F.3d at 813 (in which two action alternatives were virtually identical); *California v. Bergland,* 483 F.Supp. 465, 489 (E.D.Cal.1980), *aff'd in part and rev'd in part,* 690 F.2d 753 (9th Cir.1982) (noting that FS offered no alternative that allocated between 34 and 100% of areas to wilderness). The two action alternatives, Alternatives B and C, for example, are not identical, and Alternative B does not favor logging over restoration; rather, it is a combination of both, allowing logging in the south but not the north.

The Court therefore concludes that the FS considered a reasonable range of alternatives in the EA.

### 4. *Public Participation*

In its briefing, EPIC initially argued that the FS violated NEPA because the specialists' reports on wildlife and wildlife habitat, fuels and fire risk, and roads were not subjected to adequate public review. The FS's main argument in response was that the reports were subject to sufficient public review because they were incorporated by reference in the EA. At the summary judgment hearing, EPIC focused solely on the reports on wildlife and wildlife habitat and conceded that an agency may incorporate by reference in an EA.[13]

EPIC also clarified that it was not asserting that the wildlife specialists' reports which were discussed in the EA were insufficiently incorporated by reference. Rather, EPIC's argument was that the FS should have identified effects on late-successional wildlife and wildlife habitat as one of the "primary" issues in the EA—thereby warranting "full" discussion in the body of the EA—and that, by failing to do so, the agency failed to adequately involve the public. *See* Pl.'s Reply at 12 (asserting that the FS's incorporation by reference "is not a substitute for analysis within the body of the NEPA document itself"); *see also* AR 4596–97 (EA; listing only three main issues to address in the EA, *i.e.,* insects and disease, use of borax, and visuals). In support of this argument, EPIC cites the regulations implementing NEPA that discuss in broad terms the need for public participation. *See, e.g.,* 40 C.F.R. § 1501.4(b) (providing that "[t]he agency shall involve environmental agencies, applicants, and the public, to the extent practicable, in preparing [environmental] assessments"); *id.* § 1506.6(a) (providing in part that agencies shall "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures"); *see also* Pl.'s Reply at 12 (also citing 40 C.F.R. §§ 1500.2(d), 1503.1(a)(4), 1506.6(e)).

While the Court agrees that these regulations underscore the importance of public participation, *see Citizens for Better For-*

---

**12.** Regarding the fire risk purpose for the DA Timber Sale, EPIC argues that the agency's decision to approve the sale was arbitrary and capricious because the FS's own National Fire Plan indicates that logging should not be relied on to reduce fire risks. *See* AR 4669 (EA; public comment). The FS, however, reasonably responded to this argument in the public comment section of the EA. *See* AR 4669 (EA; noting that the National Fire Plan "was developed to address fuel reduction as the primary purpose" so that the plan does not specifically apply to projects like the Divide Auger timber sale with 'modified timber'

as its primary emphasis; adding that timber harvest will increase fuels but that MNF Plan provides standards and guidelines to address such).

**13.** The incorporation-by-reference regulation on its face applies only to EISs, *see* 40 C.F.R. § 1502.21 (discussing incorporation by reference in an EIS); however, given that an EA is supposed to be a "concise public document," *id.* § 1508.9, it is reasonable to conclude that the regulation applies, at least in principle, to EAs as well.

*estry v. USDA,* 341 F.3d 961, 970 (9th Cir.2003) ("Although we have not established a *minimum* level of public comment and participation required by the regulations governing the EA and FONSI process, we clearly have held that the regulations at issue [*i.e.,* 40 C.F.R. § 1501.4(b) and § 1506.6] must mean something."), it also finds that the FS complied with these regulations. By covering the issue of impacts on late-successional wildlife and wildlife habitat in the EA, with a fuller discussion of the issue being provided in the wildlife specialists' reports that were incorporated by reference into the EA, the FS made reasonably diligent efforts to involve the public during the NEPA process, especially since an EA is designed to be a "concise public document."[14] 40 C.F.R. § 1508.9.

Furthermore, EPIC has not demonstrated any real likelihood of prejudice flowing from the alleged omission of a "full" discussion of the issue of impacts on late-successional wildlife and wildlife habitat in the EA. The wildlife specialists' reports, which were all incorporated by reference into the EA, were all available to the public as demonstrated by EPIC's ability to obtain the documents through FOIA requests. *See* Pl.'s Mot. at 30 (identifying three FOIA requests); 40 C.F.R. § 1506.6(f) (providing that an agency shall "[m]ake environmental impact statements, the comments received, and any underlying documents available to the public pursuant to the provisions of the Freedom of Information Act"). While a final version of the Wildlife BE was not completed until

June 6, 2003, the day that the FS's Decision Notice and FONSI for the DA Timber Sale was issued, a draft version was available prior thereto, *see* AR 4035 (letter of 6/7/02 from MNF to EPIC; providing draft wildlife specialists' reports); AR 4390 (letter of 12/5/02 from EPIC to MNF; noting that previously draft wildlife specialists' reports were available and requesting final versions), and there is no evidence that there were any material differences between the draft and final versions.

█ That being said, public participation during the NEPA process was inadequate in one respect which became evident at the hearing on the summary judgment motions. At the hearing, the FS stated that, in considering the effects of the DA Timber Sale, it considered and relied on not only the wildlife specialists' reports but also the FWS Biological Opinion.[15] *See* AR 4489 *et seq.* (FWS Biological Opinion). However, the agency failed to point to any place in the EA where it incorporated the FWS Biological Opinion by reference, thus failing to provide the public with notice of its reliance on the document and depriving the public of the opportunity to review the document. *See Citizens for Better Forestry,* 341 F.3d at 970 (stating that regulations governing public participation must be given some effect). Moreover, the FWS Biological Opinion was not even provided to the FS itself until June 4, 2003, *see* AR 4489 (FWS Biological Opinion), well after the EA was posted in November 2002 and only two days before the FS's Decision

---

14. For the same reasons, the Court holds that there was sufficient public participation with respect to the reports on fuels and fire risk. Moreover, the Court notes that, in its briefing, EPIC did not point to any harm resulting from the alleged lack of public review with respect to the reports on fuels and fire risk. In contrast, EPIC did argue harm from the alleged lack of public review with respect to

wildlife and wildlife habitat—*i.e.,* a lack of public review regarding the cumulative effects on late-successional wildlife and wildlife habitat (including the effects on roads).

15. Notably, the FS has also relied on the FWS Biological Opinion in its briefing. *See, e.g.,* Def.'s Opp'n at 16; Def.'s Mot. at 6–7.

Notice and FONSI for the DA Timber Sale was issued on June 6, 2003. Given this timeframe, the possibility for public review of a document on which the FS stated that it relied as part of its decision regarding the sale was virtually nonexistent. *Cf. Cold Mountain v. Garber*, 375 F.3d 884, 893 (9th Cir.2004) (holding that FS did not violate NEPA, in part because it solicited public comments and made available all relevant documents).

Accordingly, the Court finds that there was a NEPA violation inasmuch as there was no adequate opportunity for public review of the FWS Biological Opinion on which the FS relied.

## B. *NFMA*

EPIC asserts that the FS violated NFMA by failing to ensure species diversity and viability, in particular, with respect to the northern spotted owl, goshawk, marten, and fisher, all of which are wildlife dependent on late-successional forest.

NFMA governs the management of our national forests. It provides a two-step process for forest planning. First, the Forest Service must develop a Land Resources Management Plan (also known as a forest plan) for all national forest lands.[16] Implementation of the forest plan then occurs at the site specific level. Activities in the forest, including timber sales, must be determined to be consistent with the governing forest plan.

*Native Ecosystems Council v. Dombeck,* 304 F.3d 886, 897 (9th Cir.2002); *see also Rittenhouse,* 305 F.3d at 962 ("[A]ll management activities undertaken by the Forest Service must comply with the forest plan, which in turn must comply with the Forest Act …"); 16 U.S.C. § 1604(a) ("[T]he Secretary of Agriculture shall develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System …."); *id.* § 1604(i) ("Resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans.").

The Ninth Circuit has emphasized that "NFMA imposes substantive duties on the Forest Service, one of which is the duty to 'provide for diversity of plant and animal communities.'" *Inland Empire,* 88 F.3d at 759 (quoting 16 U.S.C. § 1604(g)(3)(B)). The Ninth Circuit has also highlighted that, pursuant to NFMA regulations, the FS has a "duty to ensure viable, or self-sustaining, populations," a duty that "applies with special force to 'sensitive' species" such as the goshawk, marten, and fisher and therefore presumably applies with equal force to endangered and threatened species such as the northern spotted owl. *Id.* This duty regarding species viability arises from former 36 C.F.R. § 219.19, in effect at the time the MNF Plan was issued.[17] The regulation provides that

---

16. In the instant case, there is the MNF Plan, which as noted above incorporates the NW Forest Plan. *See* AR 2029 (MNF Plan; stating that the MNF Plan "fully incorporates all applicable land allocations and standards and guidelines" of the NW Forest Plan).

17. This regulation was not in effect at the time of the approval of the DA Timber Sale. However, both parties cite this regulation, and it was controlling at the time that the MNF Plan was issued in February 1995. The regulations in effect at the time of the DA

Timber Sale's approval are structured somewhat differently from the 1995 regulations but basically they still provide for diversity, viability, etc. In any event, EPIC's NFMA arguments are largely dependent on violations of the MNF Plan, and the MNF Plan against which the action herein was challenged may fairly be interpreted consistent with the regulations applicable when the plan was issued. Accordingly, given the implicit assumption of the parties, the Court bases its analysis in the case at bar on those regulations.

[f]ish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area. For planning purposes, a viable population shall be regarded as one which has the estimated numbers and distribution of reproductive individuals to insure its continued existence is well distributed in the planning area. In order to insure that viable populations will be maintained, habitat must be provided to support, at least, a minimum number of reproductive individuals and that habitat must be well distributed so that those individuals can interact with others in the planning area.

36 C.F.R. § 219.19.[18]

Under § 219.19, not only does the FS have a duty to insure species viability but it must also estimate and monitor the effect of forest management on populations of certain species in a forest, more specifically, MIS. *See* 36 C.F.R. § 219.19(a)(1)-(7). The regulation notes, *inter alia:*

(1) In order to estimate the effects of each [forest planning] alternative on fish and wildlife populations, certain vertebrate and/or invertebrate species present in the area shall be identified and selected as management indicator species....

(2) Planning alternatives shall be stated and evaluated in terms of both amount and quality of habitat and of animal population trends of the management indicator species.

. . . . .

(6) Population trends of the management indicator species will be monitored and relationships to habitat

changes determined. This monitoring will be done in cooperation with State fish and wildlife agencies, to the extent practicable.

*Id.* § 219.19(a)(2), (6).

Related to § 219.19, which requires monitoring of MIS, are 36 C.F.R. § 219.11 and § 219.12, which address respectively forest plan content and the forest planning process. Former § 219.11(d) provides that a forest plan has to contain "[m]onitoring and evaluation requirements that will provide a basis for periodic determination and evaluation of the effects of management practices." *Id.* § 219.11(d). Former § 219(k), titled "monitoring and evaluation," provides:

At intervals established in the plan, implementation shall be evaluated on a sample basis to determine how well objectives have been met and how closely management standards and guidelines have been applied. Based upon this evaluation, the interdisciplinary team shall recommend to the Forest Supervisor such changes in management direction, revisions, or amendments to the forest plan as are deemed necessary.

*Id.* § 219.12(k).

According to EPIC, the FS violated NFMA because (1) the FS did not comply with its monitoring obligations under the MNF Plan; (2) it failed to ensure species diversity and viability by following a "proxy-on-proxy" approach with respect to monitoring (*i.e.,* monitoring habitat for each MIS rather than monitoring each MIS directly); even if it could use habitat as a proxy, (3) it did not have sufficient information about habitat for the northern

---

**18.** The Ninth Circuit has stated that § 219.19 applies not only to forest plan-level management actions but also project-level management actions. *See Inland Empire,* 88 F.3d at 760 n. 6 (concluding that § 219.19 applies to specific projects, not just forest plans in general); *Utah Environmental Congress v. Bosworth,* 372 F.3d 1219, 1225 (10th Cir.2004) ("[R]ead as a whole, the regulations anticipate application of § 219.19 to project level as well as plan level management actions.").

spotted owl, goshawk, marten, and fisher and (4) based on the record, there was not sufficient habitat for species dependent on late-successional forest; and (5) it did not properly inventory the goshawk as required by the MNF Plan. Each argument is addressed below. Before addressing these issues on the merits, however, the Court must first address the FS's argument that the Court does not have subject matter jurisdiction under the APA over EPIC's NFMA claim. This argument applies largely to issue (1) above but also has some relevance for issues (2) through (4) since all concern monitoring obligations on the part of the FS.

1. *Subject Matter Jurisdiction Under APA*

The FS's argument regarding lack of subject matter jurisdiction is based on the Ninth Circuit opinion *Ecology Center, Inc. v. United States Forest Serv.*, 192 F.3d 922 (9th Cir.1999). In *Ecology Center*, the plaintiff claimed that the FS failed to comply with monitoring duties imposed by NFMA and its implementing regulations with respect to the Kootenai National Forest ("KNF"). *See id.* at 923. Under the KNF Plan, the FS was "required to produce annual, biannual, and five-year reports containing monitoring data helpful for the Forest Service to make 'periodic determinations and evaluations of the effects of management practice.'" *Id.* at 924. The FS admitted that it failed to publish annual reports in 1988 and 1993; it also admitted that "the reports it published presented inadequate results with regard to some of the monitoring items." *Id.* However, the FS argued that the court did not have subject matter jurisdiction over the plaintiff's claim under the APA because the agency's inadequate monitoring efforts did not constitute final administrative agency action subject to judicial review. *See id.*

The Ninth Circuit began its opinion by noting that, for an agency action to be considered final under the APA, "(1) the action should mark the consummation of the agency's decision making process; and (2) the action should be one by which rights or obligations have been determined or from which legal consequences flow." *Id.* at 925. With respect to the first factor, the court held that the plaintiff failed to show that monitoring under the KNF Plan was "an action that marks the culmination of a decision making process"; rather, "monitoring and reporting are only steps leading to an agency decision." *Id.* As for the second factor, the court stated that the FS's monitoring duty was mandatory under the KNF Plan, but "legal consequences do not necessarily flow from that duty, nor do rights or obligations arise from it." *Id.* The plaintiff failed to identify any concrete agency action that directly caused it harm. *See id.*

██ Contrary to what the FS argues, *Ecology Center* does not dispose of the NFMA claim. *Ecology Center* simply establishes that inadequate monitoring by itself does not constitute final agency action. "However, the courts clearly permit a plaintiff to raise claims *pertaining* to inadequate monitoring by bringing an APA challenge to a *final* decision." *Id.* at 926 n. 6 (emphasis added). In support of this statement, the Ninth Circuit cited *Thomas*, a case in which the plaintiff challenged the decision of the FS to allow a specific timber sale on the grounds that the agency had allegedly failed, in contravention of the forest plan, to monitor trout populations in streams affected by the sale. *See Thomas*, 137 F.3d at 1153.

In *Alexander*, the Ninth Circuit reiterated this point. The plaintiffs in *Alexander* claimed that the FS violated NFMA by, *inter alia*, failing to monitor population trends to ensure species viability and that

this failure tainted the FS's approval of a specific timber sale called the Grade/Dukes sale. *See Alexander*, 303 F.3d at 1066. Relying in part on *Ecology Center*, the defendants argued that a court does not have the power to remedy defects in forest-wide monitoring. *See id.* at 1067. The Ninth Circuit agreed that forest-wide monitoring, even when required by a forest plan, is not final agency action under the APA. However, it then went on to hold that forest-wide management practices can be reviewed if a plaintiff challenges a specific, final agency action—such as a specific timber sale—"the lawfulness of which hinges on these practices." *Id.* In short,

> monitoring and management practices are reviewable when, and to the extent that, they affect the lawfulness of a particular final agency action. Where the Forest Service generally fails to comply with NFMA and the governing Forest Plan, and where that failure renders an approval of a timber sale unlawful, [a] court has power, under the APA to review the sale and to conclude that its approval was unlawful—even if doing so would, as a practical matter, require us to consider forest-wide management decisions.

*Id.* Because, in the instant case, EPIC is not simply issuing a broad challenge to the FS's monitoring but rather arguing that its failure to monitor has rendered the DA Timber Sale unlawful, the Court concludes that it does have *prima facie* subject matter jurisdiction under the APA.[19]

The Court therefore addresses the merits of each of the arguments raised be EPIC identified above.

### 2. *Monitoring Obligations*

EPIC first asserts that there has been a violation of NFMA because the FS failed to comply with two monitoring obligations dictated by the MNF Plan, thereby tainting the DA Timber Sale. Those monitoring obligations are as follows:

*Monitoring Objective:* To ensure that habitat is maintained in specified amounts and distribution for Management Indicator Species of wildlife.

| | |
|---|---|
| *Method:* | Evaluation of all activities with the potential to cause changes in habitat capability for Management Indicator Species of wildlife. |
| *Standard:* | Moderate or better quality habitat as described in the Habitat Capability Models. |
| *Precision:* | Moderate |
| *Frequency:* | Each project with an annual summary |
| *Responsibility:* | Fish and Wildlife |

*Monitoring Objective:* To assess whether MIS populations are being affected; to determine that selected MIS are appropriate; and to determine whether standards and guidelines are effective.

| | |
|---|---|
| *Method:* | Evaluation of the most recent inventory data and comparison to Habitat Capability Models |
| *Standard:* | Habitat Capability Models |
| *Precision:* | High |
| *Frequency:* | Two species per year on a rotating basis |
| *Responsibility:* | Fish and Wildlife |

AR 2098 (MNF Plan). Habitat capability models "were developed for use in Land Management and project level planning to describe habitat conditions needed to sustain Management Indicator Species (MIS) at different wildlife population levels." AR 2111 (MNF Plan). The models can be found in the administrative record at AR 2111 *et seq.* (MNF Plan).

---

**19.** As discussed below, on closer examination, the Court concludes that EPIC has failed to state a basis for relief under *Alexander* with respect to one aspect of the monitoring claim. *See* Part III.B.2, *infra.*

Because the administrative record does not appear to contain clear documentation on the extent of monitoring by the FS, the Court issued an order asking the parties to file supplemental briefs addressing, *inter alia*, this issue as well as the issue of whether, if the Court were to find the record evidence incomplete, remand would be appropriate. *See* Docket No. 46 (order of 8/18/04).

In its supplemental brief, EPIC argues first that there is " 'absolutely no evidence in the record indicating that the agency has actually complied with these monitoring duties.' " Pl.'s Supp. Br. at 1. EPIC then contends that there should not be a remand because the burden is on the FS to prepare the administrative record, *see Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985) ("The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court."), and, if the agency did not prepare a complete record, it should bear the consequences of its failure to do so.

In its supplemental brief, the FS claims that the administrative record does show compliance with at least part of its monitoring duties; that is, under the first monitoring objective, the agency first monitors how each FS project affects habitat for each MIS and then prepares an annual summary of all project MIS monitoring. The MIS Report satisfies the first part of the first monitoring objective. *See* Defs.' Supp. Br. at 2. However, the FS concedes that "[t]he administrative record does not contain annual summaries as described in the second part of the first monitoring objective, or evaluations of MIS habitat capability models as described in the second monitoring objective." Defs.' Supp. Br. at 2. Although the administrative record does not demonstrate that the latter

types of monitoring were conducted, the FS argues that there still should not be a remand because its "compliance with forest-wide monitoring objectives ... is not actionable under the APA, and EPIC has failed to meet its burden of proving that the Forest Service's habitat capability models are deficient or that they prevent the Forest Service from meeting its NFMA obligations." Def.'s Supp. Br. at 1.

As suggested above, both parties vigorously oppose remand. Although the Court has the discretion to remand under certain circumstances, *see Florida Power & Light*, 470 U.S. at 744, 105 S.Ct. 1598 ("If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."), it will not here. Not only is remand opposed by both parties, but also, even if a remand were ordered, it is unlikely that the FS would supplement the administrative record with evidence showing that the monitoring at issue did take place. Nowhere in its briefing has the FS even suggested that the monitoring did occur (with the exception of the MIS Report) and, even though the agency has not been shy about providing extra-record evidence for other issues, it has made no effort to do so on this particular issue. The Court therefore shall address the merits of the monitoring issue based on the present record.

As a preliminary matter, it is important to note that, although the Court has subject matter jurisdiction over this claim because EPIC's challenge to the FS's alleged failure to monitor is tied to a final agency action (*i.e.,* the DA Timber Sale), "not all forest-wide practices [such as monitoring]

may be challenged on the coattails of a site specific action [such as a timber sale]; there must be a relationship between the lawfulness of the site-specific action and the practice challenged." *Alexander*, 303 F.3d at 1067. In *Alexander*, the Ninth Circuit held that, although the structure of the plaintiffs' complaint left "much to be desired," the plaintiffs had alleged a sufficient connection between the forest-wide NFMA claims and their challenge to the Grade/Dukes timber sale. *Id.* More specifically, the complaint contained allegations that the FS's "forest-wide failures to protect old growth habitat and species in accordance with NFMA and the Forest Plan render the approval of a specific mature growth timber sale, Grade/Dukes, unlawful." *Id.* at 1068.

■ In this regard, EPIC contends that, based on the record, either the FS did not prepare the annual monitoring summaries or it failed to integrate them into the DA Timber Sale, *see* Pl.'s Mot. at 34, and argues that this was problematic because the summaries were how the agency ensured that its habitat capability models were still valid; the failure to prepare the summaries thus tainted the DA Timber Sale. While EPIC thus asserts some relationship between the FS's alleged failure to meet its monitoring obligations and the DA Timber Sale, EPIC establishes a causal connection only with respect to the *second* monitoring objective (*i.e.*, failure to evaluate inventory data and compare with habitat capability models) and not the *first* (*i.e.*, failure to prepare an annual summary of all project MIS monitoring).

As noted above, the first monitoring objective has two parts: The FS must (1) monitor how each FS project affects habitat for each MIS and then (2) prepare an annual summary of all project MIS monitoring. There is no dispute that the MIS Report satisfies the first part. It is only

the annual summary that is at issue. EPIC has not demonstrated how there is a causal connection between the alleged failure to prepare the annual summary and the allegedly unlawful approval of the DA Timber Sale.

It is difficult to discern how the failure to compile an annual summary of all project MIS monitoring will have any material effect in a case such as this where a NEPA violation is asserted based in part on the cumulative impacts analysis. The MNF Plan adds little to the analysis required under NEPA. As noted above, the FS must, in preparing the EA for the DA Timber Sale, consider the cumulative effects of all past, current, and reasonably foreseeable future projects that could impact MIS. This assessment must be undertaken regardless of whether a separate document in the form of an annual summary of projects is prepared. To the extent such a summary includes projects outside the subject sale which do not contribute to a cumulative impact, they are irrelevant to the subject sale. If after an adequate EA (including cumulative impact analysis) is completed, a valid FONSI is rendered, then it would follow *a fortiori* that the MIS diversity or viability is not threatened by the DA Timber Sale. Accordingly, under these circumstances where NEPA requires an EA and examination of cumulative effects in assessing potential impacts upon MIS, the Court discerns no causal connection between the MNF Plan annual summary and the lawfulness of the proposed timber sale at issue as required under *Alexander*. No claim is stated as to this alleged violation.

■ The Court thus turns to the second monitoring objective, which requires the FS to "[e]valuat[e] the most recent inventory data and compar[e] to Habitat Capability Models" in order "[t]o assess whether MIS populations are being affect-

ed; to determine that selected MIS are appropriate; and to determine whether standards and guidelines are effective." AR 2098 (MNF Plan). Here, there is a sufficient causal connection between the alleged failure to monitor and the allegedly unlawful DA Timber Sale. The DA Timber Sale will involve the harvesting of late successional forest, and the northern spotted owl, goshawk, marten, and fisher are all wildlife dependent on late successional habitat. According to EPIC, the assessment of habitat for these species in the EA and the wildlife specialists' reports was based on the habitat capability models of the MNF Plan. Therefore, if the FS failed to monitor to ensure that the models are accurate, this could undermine the reliability of those models and thus subject these species to endangerment in the DA area. The important role of periodic monitoring and assessment of models provided for in the MNF Plan is reinforced by the monitoring regulations cited above. *See* 36 C.F.R. §§ 219.19(a)(6), 219.11(d), 219.12(k). The MNF Plan's monitoring obligations function to implement these regulations. Accordingly, there is a sufficient causal claim to proceed under *Alexander*. As in *Alexander*, "forest-wide failures to protect old growth habitat and species in accordance with NFMA and the Forest Plan render the approval of a specific mature growth timber sale, [the DA Timber Sale], unlawful." *Alexander*, 303 F.3d at 1068.

The FS contends, however, that the Supreme Court's recent decision in *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004), bars EPIC's claim as the Supreme Court held that an agency's monitoring objectives cannot establish legally binding commitments that are enforceable under the APA. In *Norton*, the plaintiff sought declaratory and injunctive relief for the failure of the Bureau of Land Management ("BLM") to act to protect public lands in Utah from damage caused by off-road ve-

hicle use. *See id.* at 2377–78. One of the claims asserted by the plaintiff was that the BLM failed to comply with certain provisions in its land use plan—more specifically, (1) the plan's statement that a certain area known as the Factory Butte area " 'will be monitored and closed if warranted' " and (2) the plan's general discussion of "use supervision and monitoring" in designated areas. *Id.* at 2382. The Supreme Court rejected the plaintiff's claim and held that "a statement in a plan that BLM 'will' take this, that, or the other action" is not a binding commitment that can be compelled, "at least absent clear indication of binding commitment in the terms of the plan." *Id.* "[A] land use plan is generally a statement of priorities; it guides and constrains actions, but does not (at least in the usual case) prescribe them." *Id.* at 2383.

While *Norton* and the instant case are similar as both involve monitoring obligations on the part of an agency under a land use or forest plan, there is an important difference between the two. *Norton* dealt with a claim under 5 U.S.C. § 706(1), which provides a court with the authority to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). In contrast, the instant case is a challenge under § 706(2). *See id.* § 706(2) (providing that a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be ... (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; ... (D) without observance of procedure required by law"). The instant case entails not a *failure* to act as in *Norton*; rather, this involves a challenge to an affirmative final agency *action*. Therefore, *Norton* is not controlling here. *See Oregon Natural Desert Ass'n v. United States Forest Serv.*, No. 03–381–HA, 2004 WL 1592606, at *9, 2004 U.S. Dist. LEXIS 13695, at *26–27 (D.Or. July 15, 2004) (rejecting defendants'

attempt to portray plaintiffs' claims as "'failure to act' allegations similar to those rejected in *Norton*," in part because plaintiffs were challenging final agency actions pursuant to § 706(2), including decisions to authorize grazing allegedly inconsistent with the forest plan).

The Court thus addresses the merits of the alleged failure to monitor with respect to the second monitoring objective. Here, the alleged failure to monitor is the failure to "[e]valuat[e] the most recent inventory data and compar[e][it] to Habitat Capability Models." AR 2098 (MNF Plan). It is not entirely clear what is meant in the MNF Plan by "the most recent inventory data." Neither the MNF Plan nor the NFMA regulations indicate how "recent" inventory data must be. Presumably, the FS cannot rely on inventory data from, *e.g.*, decades ago, but that does not necessarily mean that, under this monitoring obligation, the agency has to conduct new inventories every time it has a new project or even that it cannot rely on inventory data from a few years past. *Cf. Lands Council*, 379 F.3d at 748–49 (noting that reliance on fish count surveys of at least six years old "is suspect"; adding that data about habitat of certain fish species "was too outdated to carry the weight assigned to it"). The administrative record indicates that there was some inventorying of the relevant species here within the past several years, although the inventorying may not have been complete (*e.g.*, northern spotted owl), *see* AR 4469 (stating that southern units of DA Timber Sale

have current surveys but that northern units are "not considered to be currently surveyed"), or precisely targeted (*e.g.*, marten and fisher).[20] *See* AR 4476 (MIS Report; referring to "[g]eneral furbearer track plate surveys ... conducted in portions of the Forest in 1993 and 2000," although also noting that there have been no sightings in the project/analysis area and limited sightings elsewhere).

This issue of the adequacy of inventory data, however, need not be resolved here because, even if the inventory data were adequate—*i.e.*, the monitoring obligation to evaluate "the most recent inventory data" were satisfied—there is no evidence in the administrative record that the agency then *compared* that information to the habitat capability models to ensure that the models are still valid, a requirement explicitly set forth in the MNF Plan and which implements the applicable regulations including 36 C.F.R. §§ 219(a)(6), 219.11(d), and 219.12(k).

In response, the FS relies on *Gifford Pinchot Task Force v. United States Fish & Wildlife Serv.*, 378 F.3d 1059 (9th Cir. 2004), contending that EPIC has failed to show "affirmative evidence" that the habitat capability models are in fact flawed. *Id.* at 1068. However, no such showing need to made in this context. Based on the record before the Court, there is no evidence that the FS conducted the kind of periodic monitoring and evaluation of the habitat capability models required by the MNF Plan. Violation of this element of the

---

**20.** In its briefing, the FS suggests that inventorying of the northern spotted owl, goshawk, marten, and fisher may not be possible because they are reclusive species. *See* Def.'s Reply at 12 n. 2. If, in fact, a species is reclusive, it may be difficult for the FS to inventory that species. It would seem to the Court that, so long as the FS has made a reasonable effort to inventory the species, then the agency cannot be said to have acted arbitrarily or capriciously if inventory data is limited or not obtainable. *Cf. Inland Empire*, 88 F.3d at 762 ("The [Forest] Service did not engage in a more extended analysis of the owl's nesting and feeding habitat requirements because such data were unavailable. We believe that an analysis that uses all the scientific data currently available is a sound one.").

MNF Plan is a violation of NFMA. *See Alexander,* 303 F.3d at 1061–62 (stating that, pursuant to 16 U.S.C. § 1604(i), "[s]pecific projects, such as [a] timber sale, must be analyzed by the Forest Service and the analysis must show that each project is *consistent* with the [forest] plan") (emphasis added); 16 U.S.C. § 1604(i) ("Resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans.").

Even if the mere fact of failure to conduct the monitoring required by the MNF Plan did not constitute a per se violation of NFMA, a closer analysis demonstrates that the failure is material to NFMA's objective of protecting species diversity and viability and violates 36 C.F.R. § 219.19, which requires management steps to safeguard species diversity and viability. *Gifford Pinchot Task Force* is, in fact, instructive in this regard.

In *Gifford Pinchot Task Force,* the FWS relied on the habitat allocation of the forest plan (especially LSRs) to support its finding that the proposed timber projects would not jeopardize the northern spotted owl under the Endangered Species Act. *See Gifford Pinchot Task Force,* at 1067–68. The plaintiffs argued that the FWS improperly relied on compliance with the forest plan to make the no jeopardy finding because the forest plan did not have "effectiveness monitoring results" to ensure that management practices in the forest were meeting the standards and guidelines of the forest plan. *See, e.g.,* AR 2083 (MNF Plan; describing effectiveness monitoring). The Ninth Circuit ultimately ruled against the plaintiffs, finding that there was sufficient evidence of monitoring to support reliance on the forest plan's predictions. However, importantly, the court stated that, "[i]f such effectiveness monitoring were not taking place, or if the on-going monitoring reveals that the [forest plan] is not meeting expectations, we would not allow the FWS to rely simply upon the NFP's predictions. Without such affirmative evidence, however, we refrain from punishing the FWS for relying on the [forest plan]." *Gifford Pinchot Task Force,* at 1068.

Although the statute allegedly violated in *Gifford Pinchot Task Force* was the Endangered Species Act and not NFMA, this difference is not material. *Cf. id.* at 1066 n. 4 (applying analysis of proxy-on-proxy approach discussed in NFMA cases to this case involving the Endangered Species Act). The reasoning of the court in *Gifford Pinchot Task Force* parallels the issues here. The question is whether the FS can reasonably rely on certain predictions contained in, *e.g.,* a forest plan (*Gifford Pinchot Task Force*) or a habitat capability model (the case at bar). As in *Gifford Pinchot Task Force,* the reliability of the habitat capability models may be jeopardized in either of two ways: If either "monitoring were not taking place, *or* if the on-going monitoring reveals that the [habitat capability model] is not meeting expectations," then the FS cannot rely on the surrogate methodology of the model. *Id.* (emphasis added).

While the FS is correct in pointing out that EPIC has not affirmatively demonstrated the invalidity of the habitat capability models, EPIC has provided affirmative evidence that there has been a failure to monitor (*i.e.,* to compare inventory data with the habitat capability models) in a manner that raises serious questions about the reliability of the models. In *Gifford Pinchot Task Force,* the Ninth Circuit allowed the FWS to rely on the projections and assumptions of the forest plan in its jeopardy analysis precisely because "such monitoring *is* currently being conducted with a report due in 2004." *Id.* at 1068

(emphasis added); *see also id.* at 1066–67 (noting that "the FWS has a program of demographic studies that supplements and *verifies* the habitat results") (emphasis added). No such showing was made in the case at bar. Thus, the failure to perform the kind of verification called for by the MNF Plan undermines the FS's reliance upon the habitat capability models. This in turn affects the lawfulness of the DA Timber Sale under NFMA; given the potential invalidity of the FS's methodology, there is no sufficient assurance that species diversity and viability—in particular, that of late successional wildlife such as the goshawk, marten, and fisher (all sensitive species) as well as the northern spotted owl (an endangered/threatened species)—will be adequately protected in a sale that involves the harvesting of late successional forest.[21]

In sum, contrary to what the FS argues, the fact that EPIC has not demonstrated

that the habitat capability models are actually invalid does not negate its NFMA claim. The FS's failure to compare inventory data with the habitat models violates the MNF Plan, NFMA regulations, and NFMA because it renders the models sufficiently questionable that they cannot be relied upon by the FS.[22]

### 3. *Proxy–on–Proxy Approach*

EPIC contends next that the FS measured species viability improperly by using the proxy-on-proxy approach—*i.e.,* by monitoring *habitat* for MIS rather than MIS directly. EPIC suggests that the FS used the proxy-on-proxy approach at least in part because it did not have complete population data on all of the MIS. *See* P's Mot. at 33 (pointing to limited information for northern spotted owl, goshawk, marten, and fisher). For example, for the northern spotted owl, the MIS Report states that the southern part of the project

---

**21.** This underscores the causal connection between the lawfulness of the proposed sale and the alleged violation of NFMA required by *Alexander* in order to state a claim for relief under NFMA.

**22.** In its supplemental brief, the FS suggests that the habitat capability models are in fact accurate, stating that the agency "reviews and updates its MIS habitat capability models, and that the models are based on field research." Def.'s Supp. Br. at 2 (citing AR 2111 (MNF Plan)). AR 2111, however, does not reflect any reviewing and certainly not any updating of the models by the FS. Rather, it simply says that certain information was used in compiling the models, including two publications over twenty years old (dated 1982 and 1981 respectively) and "pertinent research and literature, published and unpublished, which is not referenced in the two publications above." AR 2111 (MNF Plan). Indeed, it appears to the Court that the whole point of the second monitoring objective is to reasonably ensure that the habitat capability models are up to date and correct, and the FS has provided no proof that it has other competent means of ensuring validity of the models or that the models are in fact valid

(although, admittedly, the burden of showing invalidity of the models is on EPIC as the plaintiff as indicated by *Gifford Pinchot Task Force*). *Cf. Lands Council,* 379 F.3d at 752 ("We are asked to trust the Forest Service's internal conclusions of the reliability of the spreadsheet model when the Forest Service did not *verify* the predictions of the spreadsheet model. Under the circumstances of this case, the Forest Service's basic scientific methodology, to be reliable, required that the hypothesis and prediction of the model be verified with observation.") (emphasis added).

To be sure, if the FS demonstrates that, even with the most recent inventory data acquired after reasonable efforts, the comparison is of limited utility because of the limited inventory data reasonably available, that would not preclude the FS from satisfying the MNF Plan and NFMA. But here there is nothing in the record demonstrating that the FS used all reasonable efforts to obtain reasonably current inventory data; nor is there anything in the record showing any attempt by the FS to compare that data with the habitat capability models to test their validity.

has current surveys but the northern part is not considered to be currently surveyed. *See* AR 4669 (MIS Report).

In *Inland Empire,* the Ninth Circuit first addressed the validity of the proxy-on-proxy approach. The plaintiffs in *Inland Empire* argued that, under former 36 C.F.R. § 219.19, which imparted a duty to ensure viable populations of existing native and desired non-native vertebrate species, the FS could not use the proxy-on-proxy approach—that is, that the FS could not rely on *habitat* management analysis but rather had to examine each sensitive *species'* population size, population trends, and their ability to travel between different patches of forest. *See Inland Empire,* 88 F.3d at 760. The Ninth Circuit disagreed. "The Regulation specifically provides that the Forest Service may discharge its duties through habitat management as long as 'habitat [is] provided to support, *at least,* a minimum number of reproductive individuals and that habitat [is] well distributed so that those individuals can interact with others in the planning area.'" *Id.* at 761 (quoting former 36 C.F.R. § 219.19; emphasis in original). Regarding four of the species, the court said that the FS's habitat management analysis was not conducted in any way plainly erroneous or inconsistent with this regulatory duty. "Regulation 219.19 ultimately requires the Forest Service to maintain viable populations. In this case, the Service's methodology reasonably ensures such populations by requiring that the decision area contain enough of the types of habitat essential for survival." *Id.*

The Ninth Circuit then went on to say that the FS had complied with 36 C.F.R. § 219.19(a)(2)—which provided that "[p]lanning alternatives shall be stated and evaluated in terms of both amount and quality of habitat and of animal population trends of the management indicator spe-cies"—by looking at habitat and basing conclusions on animal population trends on habitat analysis. *See id.* at 762–63. For the same reasons, the court concluded that the FS had satisfied its obligation under § 219.19(a)(6) to monitor population trends of MIS and determine relationships to habitat. *See id.* at 763 n. 12; 36 C.F.R. § 219.19(a)(6) (stating that "[p]opulation trends of the management indicator species will be monitored and relationships to habitat determined"). The Ninth Circuit then noted:

> The Service specifically found that for the smaller, more reclusive species, such as the pileated woodpecker, there is no technically reliable and cost-effective method of counting individual members of the species. In light of the Service's alternative method of population trend analysis [*i.e.,* monitoring habitat for the species rather than monitoring the species directly], its failure to monitor the actual population of the pileated woodpecker is not dispositive or unreasonable.

*Inland Empire,* 88 F.3d at 763 n. 12.

In *Rittenhouse,* the Ninth Circuit confirmed its holding in *Inland Empire* that the proxy-on-proxy approach was permissible, at least in certain circumstances, *see Rittenhouse,* 305 F.3d at 972, and, just recently, the Ninth Circuit again confirmed the use of the proxy-on-proxy approach in *Gifford Pinchot Task Force* and *Lands Council. See Gifford Pinchot Task Force,* at 1066 (discussing proxy-on-proxy approach and recognizing its acceptance in *Inland Empire* ); *Lands Council,* 379 F.3d at 754 ("We have, in appropriate cases, allowed the Forest Service to avoid studying the population trends of the Indicator Species by using Indicator Species habitat as a proxy for Indicator Species population trends in a so-called 'proxy on proxy' approach.").

██ EPIC maintains that, under *Inland Empire* and *Rittenhouse*, the proxy-on-proxy approach can be valid but only if the FS has a sufficient justification for not actually collecting and utilizing data on MIS—*e.g.*, if there is no technically reliable and cost-effective method of counting individual members of the species. *See* Pl.'s Mot. at 36. Although, in *Inland Empire*, the Ninth Circuit did take note of the FS's finding that, "for the smaller, more reclusive species, such as the pileated woodpecker, there is no technically reliable and cost-effective method of counting individual members of the species," the court did not limit the proxy-on-proxy approach to such circumstances. *See Inland Empire*, 88 F.3d at 763 n. 12. Nor is there anything in the court's reasoning that would suggest such a limit. Similarly, in neither *Rittenhouse* nor *Gifford Pinchot Task Force* nor *Lands Council*, did the Ninth Circuit say anything about limiting *Inland Empire* in the way suggested by EPIC.[23] Significantly, the current version of Part 219 of the NFMA regulations suggests that the proxy-on-proxy approach is permissible and makes no mention of any limitation such as that suggested by EPIC. *See* 36 C.F.R. § 219.11(a)(1)(ii)(B) (stating that, "[i]n addition to monitoring of ecological conditions, the plan monitoring strategy may require population monitoring for some focal species and some species-at-risk" and that "[t]his monitoring may be accomplished by a variety of methods including population occurrence and presence/absence data, sampling population characteristics, using population indices to track relative population trends, or inferring population status from ecological conditions").[24]

Of course, even though the Ninth Circuit has held that the proxy-on-proxy approach may be used, it has upheld its use only when the methodology for monitoring habitat was sound. *See also Lands Council*, 379 F.3d at 754 (acknowledging that proxy-on-proxy approach has been upheld but emphasizing that "[c]rucial to this approach ... is that the methodology for identifying the habitat proxy be sound"). In *Inland Empire*, the court found the agency's methodology was reliable but did not find so in *Rittenhouse*. As one example, the *Rittenhouse* court pointed out that

> the Monitoring Report shows that the Forest Service's methodology does not reasonably ensure viable populations of the species at issue. In addition to the conclusions of the Monitoring Report, the record demonstrates that the Forest Service's methodology for dedicating old growth is so inaccurate that it turns out there is no old growth at all in management area 35, where the Forest Service has purported to dedicate 1280 acres of old growth.

*Rittenhouse*, 305 F.3d at 972; *see also Indiana Forest Alliance, Inc. v. United States Forest Serv.*, 325 F.3d 851, 863 n. 14

---

**23.** The FS argues that, in any event, the northern spotted owl, goshawk, marten, and fisher are reclusive species. *See* Def.'s Reply at 12 n. 2.

**24.** The Court acknowledges that "[s]everal courts have held that [former] § 219.19 does not allow use of habitat as a proxy for hard population data," *Indiana Forest Alliance, Inc. v. United States Forest Serv.*, 325 F.3d 851, 864 n. 15 (7th Cir.2003) (citing *Sierra Club v. Martin*, 168 F.3d 1 (11th Cir.1999); *Utah Environmental Congress v. Zieroth*, 190

F.Supp.2d 1265, 1271–72 (D.Utah 2002); *Forest Guardians v. U.S. Forest Service*, 180 F.Supp.2d 1273, 1279 (D.N.M.2001)), but those cases are largely distinguishable. For instance, the Eleventh Circuit and District of New Mexico cases are different because there the *forest plan* specifically called for population data. *See Indiana Forest*, 325 F.3d at 864 n. 15. In any event, to the extent there is some divergence among the circuits on this question, this Court is bound to follow the Ninth Circuit's rulings on this issue.

(7th Cir.2003) ("In *Rittenhouse*, the court held that while the use of habitat availability could be used as a proxy for population data, it was inappropriate when the Forest Service's own scientific evidence invalidated that approach."). Drawing on the language in *Rittenhouse*, the Ninth Circuit in *Gifford Pinchot Task Force* stated that "[t]he test for whether the habitat proxy is permissible ... is whether it 'reasonably ensures' that the proxy results mirror reality." *Gifford Pinchot Task Force*, at 1066.

In the instant case, the FS's proxy-on-proxy approach is based upon the habitat capability models. *See* AR 2111 (MNF Plan). The problem here, as described above, is that those models have not been proven sufficiently reliable because of the failure of the agency to compare the most recent inventory data with the models. The Court therefore cannot say that the habitat capability models are "sound," *Lands Council*, 379 F.3d at 754, or that they " 'reasonably* ensure[ ]' that the proxy results mirror reality." *Gifford Pinchot Task Force*, at 1066.

#### 4. *Sufficient Information About Habitat*

■ EPIC contends that, even if the FS could use the proxy-on-proxy approach (*i.e.*, even if the FS could rely on habitat analysis to determine population trends for MIS), the agency did not have sufficient information about habitat for the northern spotted owl, goshawk, marten, and fisher. EPIC points to the Thomes Creek Watershed Analysis, which states that "knowledge of habitat characteristics selected for by [sic] northern spotted owls in this watershed is limited." AR 2685 (Thomes Creek Watershed Analysis). EPIC also points to another section of the Thomes Creek Watershed Analysis, which lists a number of species that can be found in the watershed (including but not limited to the northern spotted owl, goshawk, marten, and fisher) and then states that, "[f]or many of these species, there are not sufficient data available to determine either population counts within the watershed, or total amounts of potential habitat." AR 2652 (Thomes Creek Watershed Analysis). The problem with this citation is that it does not make clear for *which* of the many different species there is insufficient data about habitat. The Court thus considers this argument by EPIC in the context of the northern spotted owl only.

EPIC's main point seems to be that "concrete data" on habitat is necessary in order to utilize the proxy-on-proxy approach. Pl.'s Mot. at 37. Here, knowledge about habitat for the northern spotted owl is "limited." AR 2685 (Thomes Creek Watershed Analysis). While there must be some data on habitat in order to use the proxy-on-proxy approach, EPIC has overstated its case. The FS points to the fact that the agency did have some knowledge about the habitats for the MIS at issue here, including the northern spotted owl. *See* AR 4466–69, 4473–74, 4475–76 (MIS Report). The fact that habitat data is limited does not necessarily render the FS's action unlawful. In *Inland Empire*, the Ninth Circuit noted that the FS "did not engage in a more extended analysis of the owl's nesting and feeding habitat requirements because such data were unavailable." *Inland Empire*, 88 F.3d at 762. Even so, it "believe[d] that an analysis that uses *all the scientific data currently available* is a sound one." *Id.* (emphasis added). The fact that habitat data is limited does not necessarily mean that it is insufficient. EPIC has failed to demonstrate that the habitat data relied upon by the FS was so insufficient as to prevent utilization of the proxy-on-proxy approach. Nor, in contrast to the record evidence regarding the FS's failure to comply with its monitoring obligation, has EPIC demonstrated a clear violation of any explicit provision of the MNF Plan in this regard.

Thus, the Court does not find a NFMA violation in this instance.

### 5. *Sufficiency of Habitat*

EPIC argues that, even if the FS could rely on the proxy-on-proxy approach, there is evidence in the record that there is not adequate habitat to support late-successional wildlife in several of the harvest units. Although the Court finds that, under the current record evidence, the FS may not rely on the proxy-on-proxy approach, it addresses the merits to EPIC's argument to guide future proceedings.

According to EPIC, the FS claims that it is protecting late-successional habitat by "retaining 15% of the overstory trees within all timber harvest units," AR 4648(EA), as required by the MNF Plan. *See* AR 2020 (MNF Plan; providing as a forest-wide standard and guideline "[m]aintain at least 15% of federal forest lands within fifth field watersheds (20–200 square miles) in late-successional forest"). However, in the Wildlife BA, the specialist states that, for four harvest units (Units T2, S15, T20, and T21), the retention standards technically are not met.

> Unit T2 shows a mixture of M4G and M4P retained for the 15% wildlife habitat.[25] Although this does not appear to meet the retention standards stated in the [MNF Plan], due to stand conditions, this mixture meets the intent of the plan. This Unit is made up of smaller even diameter trees with scattered larger trees. In order to retain the larger tree component, as well as maintain clumping and scattered distribution, some of the M4P stands were designated for retention. The large di-

ameter trees within the M4P are equivalent to those in the M4G in terms of quality. The only difference between the M4P stands and the M4G stands are the density, rather than the size, of the trees. This also applies to Units S15, T20, and T21 with similar stand characteristics.

AR 4415 (Wildlife BA).

■■■■ EPIC disputes the conclusion that the large diameter trees within the M4P are equivalent to those in the M4G in terms of quality. For the northern spotted owl, M4G but not M4P stands are suitable for nesting and roosting. *See* AR 4423 (Wildlife BA). While M4P stands can be suitable for northern spotted owl foraging, this is true only when there is "a minimum of 40% canopy closure." AR 4423 (Wildlife BA). M4P stands, however, only have crown closure of only 20 to 39%. *See* AR 4442 (Wildlife BA). Similarly, for the marten and fisher, M4G stands can provide suitable habitat (nothing is said about M4P stands), and there must be "canopy closure [of] not less than 40%." AR 4475 (MIS Report). Notably, the Thomes Creek Watershed Analysis pointed out that the M4P "timber strata included in this late-successional forest definition may not provide habitat for low mobility species (survey and manage species) or other late-successional associated species that were intended to be assured habitat under the 15 percent late-successional standard." AR 2686 (Thomes Creek Watershed Analysis).

Nonetheless, the alleged deficiency does not constitute a violation of NFMA. EPIC's challenge must be kept in perspec-

---

**25.** Appendix A of the Wildlife BA explains the timber strata codes used to describe trees. *See* AR 4442 (Wildlife BA). M4P and M4G are similar in their "M" and "4" components: M = mixed conifer/pine/Douglas-fir; 4 = crowns of 25–40 feet in diameter. *See* AR

4442. "P" and "G" are used to describe crown closure (which is defined as "the ratio of tree species crown area to the total area within the polygon perimeter"). AR 4442–43. P = 20 to 39% crown closure; G = 40% and above crown closure. *See* AR 4442.

tive. It has pointed to a potential problem with only four of the twenty-one harvest units and, within these four units, it challenges not the quantity but rather the relative composition of the M4 stands. While the difference between M4G and M4P stands is not insignificant, the magnitude of the alleged deficiency is not one that EPIC has demonstrated is material enough to violate the MNF Plan. This is underscored by the fact that M4P stands are old growth trees, *see* AR 2686 (Thomes Creek Watershed Analysis), and it does not appear that the 15 percent retention standard established in the MNF Plan differentiates between M4G and M4P stands. Furthermore, since the M4G and M4P trees differ only in canopy closure, it was reasonable for the Wildlife BA to conclude that the grouping of the trees described therein "preserved the quality of old-growth habitat that the Mendocino Forest Plan intended." Def.'s Opp'n at 25. As the FS contends, "EPIC's attempt to inflate the significance of this inclusion of M4P trees with M4G trees to preserve clumps of habitat in 4 of 21 timber units is just the type of 'fly-specking' that the Ninth Circuit disapproved of in *Adler v. Lewis*, 675 F.2d 1085, 1099 (9th Cir. 1982)...." Def.'s Opp'n at 25.

### 6. *Inventory of Goshawk*

Finally, EPIC argues that the FS violated NFMA because it did not comply with the MNF Plan, which required the following for the goshawk: "Within LSRs and other reserved lands, complete an inventory of the identified nest sites to determine occupancy and nesting status. Inventory of other areas will be completed as part of project planning." AR 2028 (MNF Plan). According to EPIC, this statement meant that the FS was obligated to do an inventory of the goshawk as part of the project planning for the DA Timber Sale; however, the only inventory of the goshawk that the FS did as part of the sale was a single

survey for a single logging unit (21) in 2002. *See* AR 4474 (MIS Report; stating that, "[i]n 2001, one incidental sighting was recorded within Unit 21" and that "[o]ne survey was conducted for goshawks in 2002 within Unit 21"; adding that there were sightings outside of but within miles of the project boundary in the 1980s and in 1990).

In response to this argument, the FS notes that the MNF Plan requires only an inventory of nest sites, not, *e.g.*, monitoring of actual goshawk populations, and, as stated in the Wildlife BE, "[t]here are no known nest sites located within the project area." AR 4543 (Wildlife BE).

■ The Court concludes that EPIC has failed to meet its burden of proving a NFMA violation. As the FS points out, the MNF Plan requires only an inventory of nest sites, not actual goshawks. Moreover, the express language of the Plan requires only an inventory of *identified* nest sites, not necessarily an inventory to determine whether there are *new* nest sites as part of project planning. Because "[t]here are no known nest sites located within the project area," AR 4543 (Wildlife BE), it is not clear that the FS violated the MNF Plan. Furthermore, although EPIC contends that the FS's determination that there are "no known nest sites" was based inadequately on the single survey in the single logging unit, that fact is not clear from the Wildlife BE. The report states: "There are no known nest sites located within the project area. If nesting goshawks are located within the project area, a Limited Operating Period would be required surrounding the nest site. The area surrounding Unit T21 was surveyed in 2002[;] however, goshawks were not located." AR 4543 (Wildlife BE). This statement is ambiguous, suggesting even that more than the single unit was surveyed.

For these reasons, the Court concludes that EPIC has not met its burden of proving a NFMA violation. *See Sierra Club v. Marita*, 46 F.3d 606, 619 (7th Cir.1995) (in NEPA and NFMA case, stating that "[t]he party challenging the agency action also bears the burden of proof in these cases"); *Southern Utah Wilderness Alliance v. United States Forest Serv.*, 897 F.Supp. 1394, 97 (D.Utah 1995) (stating that plaintiffs failed to sustain burden of proving NFMA violation).

### C. *FS's Motion to Strike*

■ In the above paragraphs, the Court has addressed the merits of the arguments made by EPIC and the FS. However, remaining still is the FS's motion to strike two declarations submitted by EPIC in support of its motion for summary judgment, one from Cynthia Elkins, EPIC's Program Director, and another from Christine Ambrose, a member of EPIC. The FS has moved to strike the declarations in their entirety. First, the FS argues that any allegations of standing in the declarations are irrelevant because the FS did not claim lack of standing as an affirmative defense or anywhere else in its papers. Second, the FS asserts that, although the declarations "purport to address EPIC's standing to file this lawsuit[,][b]oth declarations also include opinion testimony about alleged harmful effects of the Divide Auger timber sale." D's Mot. at 1.

In response, EPIC contends that the declarations were filed *"solely* to prove that it has standing in this case," Opp'n at 1 (emphasis in original), and Ninth Circuit case law indicates that a plaintiff may submit a declaration on standing without it being considered improper extra-record evidence. *See* Opp'n at 1 (citing *Northwest Environmental Defense Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1527–28 (9th Cir.1997)). EPIC also argues that the Elkins and Ambrose Declarations

"are not provided as expert testimony that might implicate any prohibition on extra record evidence." Opp'n at 2. EPIC notes that it did not cite to the declarations to support any of its arguments on the merits.

The Court rejects the FS's argument. The fact that the FS did not raise lack of standing as an affirmative defense does not make the issue irrelevant since a court may always raise the issue sua sponte. *See Bernhardt v. County of Los Angeles*, 279 F.3d 862, 868 (9th Cir.2002) (" 'Federal courts are required sua sponte to examine jurisdictional issues such as standing.' "). Standing presents a material question. EPIC may introduce evidence regarding standing. In *Northwest Environmental*, the Ninth Circuit distinguished between affidavits filed for purposes of standing and extra-record evidence permitting the former. *See Northwest Environmental*, 117 F.3d at 1528 ("We therefore consider the affidavits not in order to supplement the administrative record on the merits, but rather to determine whether petitioners can satisfy a prerequisite to this court's jurisdiction.").

As for the FS's argument regarding extra-record opinion evidence, this argument is more persuasive. Regarding the Elkins declaration, the FS seems to have a problem with only a limited portion of the document, which states: "I believe the Forest Service's failure to comply with its legal duties in authorizing the Divide Auger Timber Sale will contribute to imminent adverse impacts to the Thomes Creek watershed and the Yolla Bolly–Middle Eel Wilderness." Elkins Decl. ¶ 10. As for the Ambrose declaration, the FS's concern is greater. *See, e.g.*, Ambrose Decl. ¶ 3 (claiming that her "work experience has allowed [her] to identify many of the environmental issues raised by the Forest Service's approach to logging on the Mendoci-

no National Forest" and then stating in subsequent paragraphs her opinions about the environmental status of the forest).

While EPIC is correct that it did not rely on either declaration to support its arguments on the merits, those parts of the declarations that contain opinion testimony border on impermissible extra-record evidence. The Ambrose declaration in particular contains testimony that is "expert-like." Under these circumstances, the Court expressly disavows reliance on the declarations except as they are relevant to standing. The Court notes that is merits-based analysis above did not rely on either the Elkins or Ambrose declaration. With this clarification, the FS's motion to strike is therefore denied.

## D. *Injunctive Relief*

Because the FS has granted in part EPIC's motion for summary judgment, the Court must consider whether the injunctive relief sought by EPIC is an appropriate remedy. As discussed in Part II.B, *supra*, in considering a request for injunctive relief, a court must consider the inadequacy of legal remedies and whether there will be irreparable injury absent an injunction. The Ninth Circuit has indicated that, absent "unusual circumstances," injunctive relief is the appropriate remedy for a violation of either NEPA or NFMA. *Forest Conservation*, 66 F.3d at 1496.

▮ In the instant case, it is clear that legal remedies will not be adequate. EPIC does not seek money damages, for example, and, even if EPIC did, it would be virtually impossible to value the harm resulting from the violations found herein. *See Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment."); *High Sierra Hikers Ass'n v. Blackwell*, 381 F.3d 886, 898 (9th Cir.2004) (noting same).

As for injury, if the DA Timber Sale were allowed to go forward, then old growth trees would be harvested and there would be no means to replace such trees in any meaningful fashion since it takes years for such trees to mature. Furthermore, the northern spotted owl is a threatened/endangered species that depends on old growth trees (not to mention sensitive species the goshawk, marten, and fisher). For the same reasons, the public interest weighs in favor of an injunction. *Cf. High Sierra*, at 899 (noting that "there is a strong public interest in maintaining pristine wild areas unimpaired by man for future use and enjoyment"). In addition, the public policy underlying NEPA is to ensure that the agency action which potentially affects the environment is taken only after thorough consideration of the relevant factors in which meaningful public participation has been allowed.

In contrast, if the DA Timber Sale were enjoined, then the FS would not get the value of the timber that would be harvested (*i.e.*, $665,542) and the surrounding communities would not get the benefit of the economic activity that the logging would likely generate. In addition, there is the possibility of heightened risk of disease and fire as described by the FS in the EA. While the latter raises serious and substantial concerns, the FS has not made any real effort to argue that this possibility constitutes such "unusual circumstances" so as to warrant the denial of an injunction that would otherwise lie. Moreover, the Court notes that its ruling on the motions for summary judgment does not preclude the FS from ultimately proceeding with a lawful timber sale in the DA area provided

that the agency meets its statutory obligations. In the final analysis, it could well be that, after full compliance with NEPA and NFMA, the FS might properly conclude that the DA Timber Sale is appropriate; in that event, the harm resulting from an injunction would be that which flows from delay, not complete denial of the sale.

Given the above, the Court grants EPIC's request for injunctive relief and hereby enjoins the FS from proceeding with the DA Timber Sale until it satisfies its statutory obligations under NEPA and NFMA. *See Muckleshoot,* 177 F.3d at 815 (enjoining activities on land until FS satisfied its NEPA and NHPA obligations).

## IV. *CONCLUSION*

For the reasons state above, the Court hereby GRANTS in part and DENIES in part EPIC's motion for summary judgment and GRANTS in part and DENIES in part the FS's motion for summary judgment. More specifically:

1. The Court grants EPIC's motion, and denies the FS's, in that the FS violated NEPA by failing to take a hard look at cumulative impacts, by failing to provide a convincing statement of reasons for the FONSI, and by failing to provide for sufficient public review.

2. The Court grants FS's motion, and denies EPIC's, in that the FS did not violate NEPA in considering a reasonable range of alternatives.

3. With respect to the alleged violations of NFMA, the Court grants the FS's motion, and denies EPIC's, for all claims except that related to the second monitoring obligation and its reliance on the proxy-on-proxy approach based on the record before the Court.

4. Finally, for the NFMA claim related to the second monitoring obligation (regarding habitat capability models) and the FS's reliance on the proxy-on-proxy approach based on the record herein, the Court grants EPIC's motion and denies the FS's.

Accordingly, the FS is hereby permanently enjoined from proceeding with the DA Timber Sale. Should the FS at some point in the future comply with NEPA and NFMA consistent with this order, it may move to dissolve this injunction. *See id.* ("enjoin[ing] any further activities on the land such as would be undertaken pursuant to the Huckleberry Mountain Exchange Agreement ... until such time as the Forest Service satisfies its NHPA and NEPA obligations").

This order disposes of Dockets Nos. 29 and 30. The Clerk of the Court is directed to enter final judgment in this case and close the file in this case.

IT IS SO ORDERED.